

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-20-2005

# USA v. Urban

Precedential or Non-Precedential: Precedential

Docket No. 03-1325

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Urban" (2005). *2005 Decisions*. Paper 1273.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1273

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

Nos. 03-1325/1326/1356/1370/1371/2315/2737/2751

————

UNITED STATES OF AMERICA

v.

THOMAS URBAN,
Appellant No. 03-1325

————

UNITED STATES OF AMERICA

v.

JOSEPH J. O'MALLEY,
Appellant No. 03-1326

————

UNITED STATES OF AMERICA

v.

JOSEPH R. LEONE,
Appellant No. 03-1356

————

UNITED STATES OF AMERICA

v.

GERALD S. MULDERIG,
Appellant No. 03-1370

———

UNITED STATES OF AMERICA

v.

FRED TURSI,
Appellant No. 03-1371

———

UNITED STATES OF AMERICA

v.

JAMES F. SMITH,
Appellant No. 03-2315

———

2

UNITED STATES OF AMERICA

v.

WILLIAM C. JACKSON,
Appellant No. 03-2737

―――――

UNITED STATES OF AMERICA

v.

STEPHEN M. RACHUBA,
Appellant No. 03-2751

―――――

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 02-cr-00165-13, 02-cr-00165-08, 02-cr-00165-05,
02-cr-00165-06, 02-cr-00165-12, 02-cr-00165-11,
02-cr-00165-03, and 02-cr-00165-09)
District Judge:  Honorable Petrese B. Tucker

―――――

Argued October 28, 2004
Before:  SCIRICA, *Chief Judge*, FISHER,
and GREENBERG, *Circuit Judges*.

(Filed: April 20, 2005)

Peter A. Levin
1927 Hamilton Street
Philadelphia, PA  19130
     *Attorney for Appellant, Thomas Urban*

F. Emmett Fitzpatrick, Jr. (Argued)
F. Emmett Fitzpatrick Law Offices
6th and Chestnut Streets
926 Public Ledger Building
Philadelphia, PA  19106
     *Attorney for Appellants, Joseph J. O'Malley*
     *and William C. Jackson*

Alan L. Yatvin
Popper & Yatvin
230 South Broad Street, Suite 503
Philadelphia, PA  19102
     *Attorney for Appellant, Joseph R. Leone*

S. Daniel Hutchison
135 North Broad Street
Woodbury, NJ  08096
     *Attorney for Appellant, Gerald S. Mulderig*

NiaLena Caravasos
F. Emmett Fitzpatrick Law Offices
6th and Chestnut Streets
926 Public Ledger Building
Philadelphia, PA  19106
     *Attorney for Appellant, Fred Tursi*

David L. McColgin (Argued)
Defender Association of Philadelphia
Federal Court Division
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA  19106
        *Attorney for Appellant, James F. Smith*

Ari S. Moldovsky (Argued)
Moldovsky & Moldovsky
834 Chestnut Street, Suite 206
Philadelphia, PA  19107
        *Attorney for Appellant, Stephen M. Rachuba*

Amy L. Kurland (Argued)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
        *Attorney for Appellee*

---

OPINION OF THE COURT

---

FISHER, *Circuit Judge*.

Appellants, plumbing inspectors employed by the City of Philadelphia, were convicted of improperly accepting payments from plumbers whose work they inspected in violation of the Hobbs Act and the Racketeer Influenced and Corrupt Organizations Act ("RICO").  They raise a host of contentions on appeal, including

5

primarily a challenge to the District Court's jury instruction regarding the Hobbs Act's requirement that the covered misconduct have affected commerce. We find none of Appellants' contentions sufficient to support overturning their convictions. We will, however, vacate their sentences in light of the United States Supreme Court's recent decision in *United States v. Booker*, 125 S. Ct. 738 (2005), and remand to the District Court for resentencing in accordance with that decision.

I.

Appellants Thomas Urban, Joseph J. O'Malley, Joseph R. Leone, Gerald S. Mulderig, Fred Tursi, James F. Smith, William C. Jackson and Stephen M. Rachuba were plumbing inspectors employed by the Construction Services Department ("CSD"), a division of the Department of Licenses and Inspections ("L&I Department") of the City of Philadelphia. The L&I Department is a regulatory agency charged with construction inspections and business regulatory affairs. The CSD is responsible for issuing all construction permits and performing construction inspections. Appellants were tasked with performing the plumbing component of these inspections, and were expected to enforce the city plumbing code in order, among other things, to ensure the safety of the city drinking water. Appellants were assigned to districts. Plumbers were required to call the offices of the district in which their job was located to set up an appointment with an inspector. Appellants had discretion to decide when to perform the inspection. In performing inspections and enforcing the plumbing code, Appellants had the power to cite violations of the code, issue stop work orders on projects, and revoke the license of any plumber who failed to comply with the code.

In the late 1990s, law enforcement became aware that plumbing inspectors were accepting monetary payments from

6

plumbers whose work they inspected, or claimed to have inspected. In the course of its investigation into this practice, the FBI interviewed several confidential sources – designated as CS1, CS2 and CS3, respectively – who had worked as plumbing inspectors alongside Appellants, or as plumbers whose work Appellants had inspected. An affidavit executed by an FBI agent, filed by the government in support of a request to install hidden cameras in city vehicles which would be used by suspected plumbing inspectors, detailed statements given by these confidential sources. CS1, a former plumbing inspector from 1992 to 1997, stated that 70%-80% of the plumbing contractors whose work he inspected during that time period "provided him with a cash 'tip' of $5 to $20 in return for his inspection and for allowing the contractor to work without interference." CS1 stated that he made an additional $3,000 to $6,000 per year from these "tips," and that acceptance of "tips" was commonplace among the L&I Department's plumbing inspectors. CS1 believed that plumbing inspectors, including specifically many of the Appellants, "regularly accept[ed] 'tips' while working in their official capacity as City inspectors[.]"

CS2, a small plumbing contractor who had allegedly interacted with plumbing inspectors through a third party, stated that he provided money used to pay a plumbing inspector named "Tursi" in 1999 and on at least ten prior occasions. CS3, a large general plumbing contractor who worked with several plumbing subcontractors, stated that he was told by his subcontractors that payments were made to an inspector named "O'Donnell" and his replacement named "Smith." The affidavit also stated that the affiant had interviewed a "cooperating witness" who had "made consensual recordings of L&I plumbing inspector Fred Tursi allegedly extorting money from him." This cooperating witness advised that he had given $50 to his plumbers to give to Tursi to "keep him off their backs."

7

On the strength of this information, the government sought and obtained from the United States District Court for the Eastern District of Pennsylvania an order authorizing the installation of hidden video cameras in two city vehicles which would be used by certain of the Appellants while on official city business. Video captured by these cameras apparently showed Appellants Jackson, Leone, O'Malley, Rachuba and Smith accepting cash on numerous occasions from plumbers during the course of conducting inspections; in many instances, Appellants apparently accepted cash payments without performing any inspection at all.

On March 19, 2002, a grand jury in the Eastern District of Pennsylvania returned an indictment of 13 plumbing inspectors, including Appellants, charging them with a violation of RICO, 18 U.S.C. § 1962, and multiple counts of Hobbs Act extortion, in violation of 18 U.S.C. § 1951. A five-week trial ensued in early September 2002. At trial, the government presented evidence showing that multiple plumbers made numerous monetary payments of varying sizes to each of the Appellants. Plumbers testified that they paid inspectors anywhere from $5 to $200 per inspection. There was ample evidence at trial that plumbers paid inspectors in order to ensure timely and favorable inspections,[1] and to prevent unfavorable treatment or harassment by inspectors. One plumber testified that "We felt like if you didn't do what was, what had been going on for years, you certainly would not see, you may not see an inspector

---

[1]Numerous plumbers testified that because of labor and equipment costs, any idle time between the completion of a project and the performance of an inspection harmed their business. It was therefore essential that plumbing inspectors arrive as soon as a project was completed, and that they perform the inspection of that project as rapidly as possible so that the plumbers could move on to their next project.

showing up when you want him[,]" while another testified that he paid inspectors because "[y]ou didn't want to get on the bad side of the inspector." Other plumbers testified that they paid inspectors because they could not afford to find out if they would be treated differently by the inspectors if they did not pay. Plumber Richard Clements testified that failing to tip could result in an inspector who would "give me a hard time, or I wouldn't get the prompt service." Yet another plumber testified that when Appellant Tursi asked him for a larger tip than offered, he complied because "I felt as though there would be some kind of problem if I didn't do it."

The government presented substantial evidence demonstrating that Appellants knew that it was improper to accept monetary payments from plumbers whose work they were inspecting, thus undermining Appellants' view that they were voluntarily (and therefore properly) accepting "tips." Each Appellant was required, at the time of hiring, to sign an ethics statement acknowledging that he was not permitted to accept "any offer, any gift, favor or service that might tend to influence" him in the discharge of his duties. Every inspector hired between 1980 and 2000 – including all of the Appellants – was told that it was against city policy for employees to take any cash in any amount at any time. An ethics directive from the Mayor of Philadelphia permitted City employees to accept up to $100 in gifts per year from any one source, but expressly disallowed their acceptance of cash in any amount.

Evidence of how Appellants accepted the plumbers' payments reinforced the government's contention that Appellants knew the payments were improper. Plumbers concealed the payments to Appellants in the pages of their work permit or by folding it up and transferring the money in what was commonly referred to as a "green handshake." In a conversation taped by a cooperating witness and played for the jury, Appellant Mulderig explained that "every time

9

they hand me a permit I, I used to fold it over like that and then put it in my pocket, you know what I mean. ... when I would go to like Boston Market or something for lunch I would go in the men's room and take it out and put it in my, you know, take the money out of there and put it in my pocket." Moreover, video taken by the hidden cameras in the city vehicles apparently revealed numerous instances of Appellants surreptitiously receiving the payments and endeavoring to keep the payments hidden.

In support of the Hobbs Act's requirement that any extortionate conduct have an effect on commerce, the government presented evidence that each Appellant accepted tips from plumbers who purchased supplies made out-of-state, i.e., outside of Pennsylvania. Many of these same plumbers, however, testified that the payments they made to Appellants did *not* affect their ability to make out-of-state purchases.

On October 18, 2002, the jury convicted all Appellants except William Jackson of the RICO charges, and all Appellants of the Hobbs Act extortion charges. The District Court imposed varying sentences on Appellants, ranging from twelve months of home confinement to thirty-four months' imprisonment, as well as fines, assessments and probation. These eight, timely, consolidated appeals followed.

II.

The District Court properly exercised subject matter jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction over the judgments of conviction pursuant to 28 U.S.C. § 1291, and over the sentences pursuant to 18 U.S.C. § 3742. Appellants raise a number of challenges to their convictions which we will address *seriatim*.

10

A.      Appellants' challenges to the jury instructions' formulation of the Hobbs Act's effect on commerce requirement and the sufficiency of the government's evidence of such effect.

Appellants' primary arguments on appeal challenge the formulation of the Hobbs Act's effect on commerce element in the District Court's jury instructions, as well as the sufficiency of the evidence adduced by the government to prove such effect.  The Hobbs Act, 18 U.S.C. § 1951(a), provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).

In pertinent part, the District Court instructed the jury as follows on the Hobbs Act charges:

> You do not even have to find that there was an actual effect on commerce.  All that is necessary to prove this element is that the natural consequences of the extortion – of the money payment, potentially caused an effect on interstate commerce to any degree, however minimal or slight.  Payment from a business engaged in interstate commerce satisfies the requirement of an effect on interstate commerce.  If the resources of a business are expended or

11

diminished as a result of the payment of money, then interstate commerce is affected by such payment and may reduce the assets available for purchase of goods, services or other things originating in other states.

Under this instruction, the jury could convict even if it did not find that Appellants' extortionate acts actually affected commerce, so long as it concluded that the "natural consequences" of the extortionate acts "potentially caused" just a "minimal" effect on interstate commerce. The jury was instructed to find this standard satisfied upon proof of a "[p]ayment" made by plumbers "engaged in interstate commerce," which payment "diminished" the plumbers' "resources," i.e., by proof of a "depletion of assets."

Appellants explicitly challenge the jury instruction's statement that proof of a "potential" effect on commerce is sufficient to prove the effect on commerce element under the Hobbs Act, and implicitly challenge the jury instruction's statement of the depletion of assets theory. In Appellants' view, the reference to "potential" effect is flawed because the Hobbs Act speaks in action verbs – "obstructs, delays or affects commerce" – and conduct which merely has the "potential" to affect commerce does not *actually* obstruct, delay or affect commerce. Appellants also argue that after a series of Supreme Court decisions between 1995 and 2000 construing the Commerce Clause, it would be constitutionally doubtful to interpret the Hobbs Act as applying to conduct which merely potentially affects commerce. Appellants further contend that the so-called "depletion of assets" theory – whereby proof that a Hobbs Act violation depletes the assets of a business engaged in interstate commerce conclusively establishes the effect on commerce requirement – was incorrectly applied here in light of the plumbers' testimony that the payments they made to Appellants did not in fact affect their ability to engage in interstate commerce. We read this latter contention as a challenge

12

to both the jury instruction's formulation of the depletion of assets theory, and to the sufficiency of the government's evidence of effect on commerce by way of the depletion of assets theory.

To the extent that Appellants challenge the District Court's interpretation of the Hobbs Act in formulating its jury instructions, or the fidelity of its interpretation and instructions to the United States Constitution, we exercise plenary review. *United States v. Singletary*, 268 F.3d 196, 198-99 (3d Cir. 2001) (citations omitted); *Gibbs v. Cross*, 160 F.3d 962, 964 (3d Cir. 1998) (citations omitted). In reviewing a challenge to the sufficiency of the evidence, we "must determine whether, viewing the evidence most favorably to the government, there is substantial evidence to support the jury's guilty verdict." *United States v. Idowu*, 157 F.3d 265, 268 (3d Cir. 1998) (citation and internal quotation marks omitted). We "will sustain the verdict if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' Thus, 'a claim of insufficiency of the evidence places a very heavy burden on an appellant.'" *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998) (citations and internal quotation marks omitted).

A comprehensive review of our Hobbs Act precedent over the past thirty years compels us to reject Appellants' challenges regarding the Hobbs Act's effect on commerce requirement and the depletion of assets theory of proving such an effect. We begin with *United States v. Mazzei*, 521 F.2d 639 (3d Cir. 1975) (*en banc*). Mazzei, a Pennsylvania state senator, engineered lease transactions between state agencies and a private entity, B.M.I., Inc., and extorted payments from B.M.I. in connection with the transactions. He was convicted of two counts of Hobbs Act extortion. Mazzei argued on appeal that the government had failed to satisfy the Hobbs Act's effect on commerce requirement because although B.M.I. was deemed to be engaged in interstate commerce, the lease transactions which

13

constituted the unlawful extortionate acts were local and did not themselves affect interstate commerce. We rejected this argument, accepting instead the government's contention that depletion of assets of an entity engaged in interstate commerce was enough, as "[t]his position accord[ed] with our previous holdings that where the resources of an interstate business are depleted or diminished 'in any manner' by extortionate payments, the consequent impairment of ability to conduct an interstate business is sufficient to bring the extortion within the play of the Hobbs Act." *Mazzei*, 521 F.2d at 642 (citing *United States v. Addonizio*, 451 F.2d 49 (3d Cir. 1972); *United States v. Provenzano*, 334 F.2d 678 (3d Cir. 1964)). We found that the facts easily satisfied this standard. B.M.I.'s subsidiaries "purchase[d] materials in a number of states for use in manufacturing products sold in almost every state[,]" *id.*, and the payments the subsidiaries made diminished "funds available to B.M.I. for use in [ ] interstate activities ... and its interstate business must to this extent be curtailed." *Id.* We "conclude[d] that the Hobbs Act may constitutionally be construed to reach the indirect burdens placed on interstate commerce by the extortionate activities alleged in this case and that such a construction of the statute accords with Congressional intent to proscribe extortion which 'in any way or degree obstructs, delays, or affects commerce.'" *Id.* (citations omitted).

In *United States v. Cerilli*, 603 F.2d 415 (3d Cir. 1979), we considered appeals of substantive and conspiracy convictions under the Hobbs Act. The Pennsylvania Department of Transportation (the "Department") leased equipment from private owners in order to perform snow removal, general road maintenance and repair responsibilities. Defendants were Department employees who had accepted bribes from such private owners in exchange for leasing their equipment. The government established at trial "that all the lessors had bought fuel for their equipment that had travelled in interstate commerce[,]" and that most of the lessors "had purchased

14

equipment and/or supplies that had travelled in interstate commerce." *Cerilli*, 603 F.2d at 423.

On appeal, defendants argued that the evidence of interstate commerce was insufficient to support their Hobbs Act convictions. We disagreed, reiterating that "where the resources of an interstate business are depleted or diminished in any manner by extortionate payments, the consequent impairment of ability to conduct an interstate business is sufficient to bring the extortion within the play of the Hobbs Act." *Id.* at 424 (quoting *Mazzei*, 521 F.2d at 642) (other citations and internal quotation marks omitted). We continued that "[a]ll that is required to bring an extortion within the statute is proof of a reasonably probable effect on commerce, however minimal, as result of the extortion." *Id.* (citations omitted). As in *Mazzei*, we found that the government's proof of depletion of assets of entities who purchased goods in interstate commerce satisfied this standard. *Id.*

We then considered and rejected defendants' argument in *Cerilli* that the depletion of assets theory "should only be applied where the victim of the extortion is itself an interstate business." *Id.* We concluded that such a limited view of the Hobbs Act's scope would be "inconsistent with Congress' purpose 'to use all the constitutional power Congress has to punish interference with interstate commerce... .'" *Id.* (quoting *Stirone v. United States*, 361 U.S. 212, 215 (1960)). We acknowledged that "the effect on interstate commerce proven here is certainly not very large," but made clear that "the Hobbs Act does not proscribe only those extortions that have a large effect on commerce." *Id.* We therefore affirmed the following jury instruction given by the district court:

> I instruct you instead that you may find interstate commerce with the meaning of these instructions if

15

you find beyond a reasonable doubt that the victim purchased goods in interstate commerce and that the money was extorted from him; then, as a matter of law, commerce was affected.

*Id.* at 424 n.11. Thus, *Cerilli* clearly endorsed the depletion of assets theory under the Hobbs Act as formulated by the District Court here.[2]

Just last year, in *United States v. Haywood*, 363 F.3d 200 (3d Cir. 2004), we reaffirmed our adherence to the depletion of assets theory of proving a Hobbs Act effect on commerce, and announced that proof of a "potential" effect is all that is required under the Hobbs Act. Haywood had been convicted of a substantive Hobbs Act violation for robbing a Virgin Islands tavern. A witness testified that the defendant and his accomplice stole "approximately $40 to $60 in bills and approximately $10 in coins." *Haywood*, 363 F.3d at 202. A Virgin Islands detective testified at trial that the tavern sold Heineken and Miller beer, both of which were shipped in "from the mainland United States." *Id.* at 210. On appeal, Haywood contended "that the government did not produce sufficient evidence to show that the bar purchased goods or services from outside the Virgin Islands."

---

[2]We reaffirmed *Cerilli*'s endorsement of the depletion of assets theory in *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982) (*en banc*). There, we reinstated defendants' Hobbs Act conspiracy convictions following the district court's grant of their motion for judgment of acquittal. In pertinent part, we observed that "[i]n substantive Hobbs Act convictions, the requisite nexus to interstate commerce has been found in the depletion of assets theory, because the payment of an extortion demand may reduce the assets available for the purchase of goods originating in other states." *Jannotti*, 673 F.2d at 592-93 (citing *Cerilli*, 603 F.2d at 424) (other citation omitted).

16

*Id.* Haywood primarily contested the foundation of the detective's testimony concerning effect on commerce, arguing that the government was required to adduce independent evidence such as an invoice in order to prove that the tavern purchased supplies originating in mainland United States. We rejected this argument. More germanely, we also rejected Haywood's contention "that there is no evidence to support the exercise of federal jurisdiction over what is really a territorial crime." *Id.* at 211 n.7. Earlier in the opinion, in laying out the controlling Hobbs Act principles, we stated that "[i]f the defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution under [§ 1951]." *Id.* at 209-10 (citation omitted). We further noted that "[a] jury may infer that interstate commerce was affected to some minimal degree from a showing that the business assets were depleted." *Id.* at 210 (citation omitted). Applying these principles, we found it "clear that interstate commerce was affected, however minimally, because the bar sold Heineken and Miller beer that came from outside the Virgin Islands[,]" *id.* at 211 n.7, and because "the bar's assets were depleted" by the robbery. *Id.*

There thus appears to be little doubt that our precedent supports the District Court's use of "potential" effect and its formulation of the depletion of assets theory in the jury instructions.[3]

---

[3]Our view on these related issues in the context of substantive Hobbs Act cases is in accord with the weight of authority in our sister circuits. The majority of our sister circuits have endorsed the "potential" effect reading of the Hobbs Act's effect on commerce requirement. *See United States v. Rivera Rangel*, 396 F.3d 476, 482-83 (1st Cir. 2005) ("The Hobbs Act ... has ... been held to reach even those effects which are merely potential or subtle.") (quoting *United States v. Hathaway*, 534 F.2d 386, 396 (1st Cir. 1976)); *United States*

17

*v. Lynch*, 367 F.3d 1148, 1155 (9th Cir. 2004) ("interstate nexus requirement is satisfied 'by proof of a probable or potential impact' on interstate commerce") (citation omitted); *United States v. Curtis*, 344 F.3d 1057, 1070 (10th Cir. 2003) ("We have repeatedly interpreted the 'broad language' of the Hobbs Act to mean that for the Government to obtain a conviction under the Act, the evidence need show only a potential or de minimis effect on interstate commerce.") (citations omitted); *United States v. Silverio*, 335 F.3d 183, 186 (2d Cir. 2003) ("effect upon interstate commerce, whether slight, subtle or even potential, [ ] is sufficient to uphold a prosecution under the Hobbs Act.") (citations omitted); *United States v. Peterson*, 236 F.3d 848, 852 (7th Cir. 2001) (a "minimal potential effect on commerce is all that need be proven to support a conviction [under the Hobbs Act].") (quoting *United States v. Stillo*, 57 F.3d 553, 558 n.2 (7th Cir. 1995)); *United States v. Brantley*, 777 F.2d 159, 162 (4th Cir. 1985) ("jurisdictional predicate [of Hobbs Act] ... may be shown by proof of probabilities without evidence that any particular commercial movements were affected."); *but see United States v. Williams*, 308 F.3d 833, 838 (8th Cir. 2002) ("the [Hobbs Act's] plain language requires an actual effect on interstate commerce, not just a probable or potential impact."); *United States v. Carcione*, 272 F.3d 1297, 1301 n.5 (11th Cir. 2001) ("A substantive violation of the Hobbs Act requires an actual, de minimis affect on commerce.") (citation omitted).  It is unclear where the Sixth Circuit stands.  *Compare United States v. Wang*, 222 F.3d 234, 237 (6th Cir. 2000) ("There is no requirement that there be an actual effect on interstate commerce--only a realistic probability that [an offense] will have an effect on interstate commerce.") (citation and internal quotation marks omitted) *with United States v. DiCarlantonio*, 870 F.2d 1058, 1061 (6th Cir. 1989) ("a substantive Hobbs Act violation requires an actual effect on interstate commerce").

18

Appellants counter with several arguments, none of which alter our view. First, Appellants invoke a trilogy of Supreme Court Commerce

There appears to be no disagreement among our sister circuits as to the propriety of the depletion of assets theory as a means of establishing the Hobbs Act's effect on commerce requirement. *See, e.g., Curtis*, 344 F.3d at 1070 ("Simply proving that a robbery depleted the assets of a business engaged in interstate commerce will suffice.") (citation omitted); *United States v. Williams*, 342 F.3d 350, 354-55 (4th Cir. 2003) ("Commerce is sufficiently affected under the Hobbs Act where a robbery depletes the assets of a business that is engaged in interstate commerce.") (citation omitted); *United States v. Jamison*, 299 F.3d 114, 120 (2d Cir. 2002) ("a robbery or extortion that depletes the assets of a business operating in interstate commerce will satisfy the jurisdictional requirement of the Hobbs Act by a minimal showing of effect on commerce.") (citations omitted); *United States v. Turner*, 272 F.3d 380, 386-87 & n.2 (6th Cir. 2001); *United States v. Diaz*, 248 F.3d 1065, 1084-85 (11th Cir. 2001) ("Robberies or extortions perpetrated upon individuals are prosecutable under the Hobbs Act when ... the crime depletes the assets of an individual who is directly engaged in interstate commerce") (citations omitted); *United States v. Bailey*, 227 F.3d 792, 798 (7th Cir. 2000) (under depletion of assets theory, "the government shows that commerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods.") (citations and internal quotation marks omitted); *United States v. Hebert*, 131 F.3d 514, 521 (5th Cir. 1997) (defining required "effect on interstate commerce [for Hobbs Act purposes] as a depletion of the assets of a business that purchases out-of-state goods and supplies.") (citations omitted); *United States v. Bucci*, 839 F.2d 825, 830 (1st Cir. 1988).

Clause cases beginning with *United States v. Lopez*, 514 U.S. 549 (1995), and proceeding to *United States v. Morrison*, 529 U.S. 598 (2000) and *Jones v. United States*, 529 U.S. 848 (2000). Appellants argue that construing the Hobbs Act to require only proof of a potential effect would be constitutionally doubtful in light of this trilogy of cases, thus compelling a strict construction of the Act as requiring proof of an "actual effect" in order to avoid constitutional doubt. But Appellants do not clearly articulate what would be constitutionally doubtful about interpreting the Hobbs Act to require only proof of a potential effect on commerce. We surmise that after the *Lopez-Morrison-Jones* trilogy, the purported constitutional doubtfulness of such a construction stems from those decisions' holdings that Congress may only regulate activities "having a substantial relation to interstate commerce .... i.e. those activities that substantially affect interstate commerce.... ." *Lopez*, 514 U.S. at 558-59. But we have already rejected the argument that *Lopez* and its progeny require proof of a "substantial effect" on commerce in an individual case in order to show a Hobbs Act violation. *See United States v. Clausen*, 328 F.3d 708, 711 (3d Cir. 2003). In *Clausen*, we followed the lead of other circuits, including the Fifth Circuit, which had held that after *Lopez*, "legislation concerning an intrastate activity will be upheld if Congress could rationally have concluded that the activity, in isolation or in the aggregate, substantially affects interstate commerce." *See United States v. Robinson*, 119 F.3d 1205, 1211 (5th Cir. 1997); *see also United States v. Bolton*, 68 F.3d 396, 399 (10th Cir. 1995) ("*Lopez* did not ... require the government to show that individual instances of the regulated activity substantially affect commerce to pass constitutional muster under the Commerce Clause. Rather, the Court recognized that if a statute regulates an activity which, through repetition, in aggregate has a substantial affect on interstate commerce, ... 'the de minimis character of individual instances arising under that statute is of no consequence.'") (citing *Lopez*, 514 U.S. at 558-59) (internal citations omitted) (ellipses

20

added) (emphasis omitted).  With respect to the Hobbs Act specifically, we stated in *Clausen* "'that the cumulative result of many Hobbs Act violations is a substantial effect upon interstate commerce,' and that substantial effect empowers Congress to regulate pursuant to the Commerce Clause."  *Clausen*, 328 F.3d at 711 (quoting *Robinson*, 119 F.3d at 1215)).  Importantly, we held that "[i]n any individual case, proof of a *de minimis* effect on interstate commerce is all that is required."  *Id.* (citations omitted).  And, as we announced recently in *Haywood*, such a "*de minimis* effect" in an individual Hobbs Act case need only be "potential."  *See Haywood*, 363 F.3d at 209-10 (citation omitted).

Appellants also suggest that contrary to our reading of *Jannotti*, we held there that proof of an actual effect on commerce was required under the Hobbs Act.  We disagree.  Appellants rely on our statement in *Jannotti* that "[a] substantive violation of the Hobbs Act *generally* is supported by proof of an actual effect on commerce." 673 F.2d at 591 (citations omitted) (emphasis added).  But saying that certain evidence "generally" supports a violation is not the same as saying that *only* that evidence supports a violation.

Finally, Appellants contend that the jury instruction's formulation of the depletion of assets theory created a mandatory presumption which improperly precluded the jury from considering evidence that commerce was not in fact affected by the plumbers' payments.  As the precedent above makes clear, however, proof of extortion payments by a person or entity engaged in interstate commerce is all the government needs to prove in order to satisfy the Hobbs Act's effect on commerce requirement, and the jury instruction faithfully expressed this principle.  It is conceivable that, as many of the plumbers testified, the payments the plumbers made did not *actually* result in a reduction in their engagement in interstate commerce – for example, the plumbers may have absorbed the cost

21

of those payments by cutting their profits or by reducing their labor force. But as we have repeatedly noted, the government need only prove that Hobbs Act extortion *potentially* affected commerce. Our "potential" effect reading of the Hobbs Act explains our continued adherence to the depletion of assets theory, because it is beyond cavil that the depletion of assets of a person engaged in interstate commerce has at least a "potential" effect on that person's engagement in interstate commerce. Indeed, had the District Court instructed the jury that, notwithstanding proof of depletion of assets of plumbers engaged in interstate commerce, it could nonetheless acquit if it credited those plumbers' conclusory testimony that their payments to Appellants did not affect their ability to purchase supplies made out-of-state, it would have misstated the law of this Circuit – extortion which depletes the assets of persons or businesses engaged in interstate commerce is, as a matter of law, a Hobbs Act violation.

The above discussion leaves little work left to do in addressing Appellants' argument that the government's evidence of depletion of assets of plumbers engaged in interstate commerce was insufficient. The jury instruction's formulation of the depletion of assets theory accords with our precedent. Appellants do not dispute that there was ample evidence that Appellants took payments from various plumbers, and that each Appellant took payments from plumbers who were engaged in interstate commerce, i.e., who purchased supplies made out-of-state. This evidence is more than sufficient to establish the Hobbs Act's effect on commerce requirement. Therefore, we conclude that the District Court's instruction that proof of a "potential" effect on commerce via the depletion of assets theory was correct, and that the government's evidence was sufficient to support Appellants' Hobbs Act convictions pursuant to that instruction.

22

B.      Appellants' challenges to the sufficiency of the evidence that they committed extortion "under color of official right" within the meaning of the Hobbs Act.

Appellants (except for Leone) also challenge their Hobbs Act convictions on grounds that the government's evidence that they committed their extortion "under color of official right" was insufficient.  As noted, in reviewing the sufficiency of the evidence, we "must determine whether, viewing the evidence most favorably to the government, there is substantial evidence to support the jury's guilty verdict." *Idowu*, 157 F.3d at 268.  We "will sustain the verdict if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  Thus, 'a claim of insufficiency of the evidence places a very heavy burden on an appellant.'" *Dent*, 149 F.3d at 187.

The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  "Thus, the statute supports two classes of extortion: extortion induced by 'wrongful use of force' and extortion 'under color of official right.'" *United States v. Antico*, 275 F.3d 245, 255 (3d Cir. 2001).  Here, the government pursued the "under color of official right" theory of Hobbs Act extortion.  In order to prove Hobbs Act extortion "under color of official right," "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans v. United States*, 504 U.S. 255, 268 (1992).  In other words, the government need not prove that the public official induced the making of the payment, or that the public official acted or refrained from acting as a result of payments made.

23

The government's evidence here was more than sufficient to support a finding of extortion "under color of official right." It was established at trial that the plumbing code conferred discretion on plumbing inspectors to require plumbers to redo a project even where the project was technically code-compliant. Numerous plumbers testified that it was important to minimize the extent to which they and expensive personnel and equipment were forced to wait around at a job site for an inspector to come and approve the work. These plumbers testified that they therefore made payments to Appellants because Appellants were plumbing inspectors and possessed authority which could be exercised to the plumbers' detriment. One plumber who made payments to Appellants testified that he made the payments because it made "the job run that much better," made "things work easier," and made "everything go much better." Another plumber, Andrew Kromchad, testified that after an incident in which Appellant Urban initially refused to allow him to finish a job by backfilling, he, Kromchad, began making payments to avoid "hassle." When Mr. Kromchad asked Appellant Urban why he initially refused to permit completion of the job, Urban responded that Kromchad was like his old boss; Kromchad testified that what he believed Urban meant by this was that his old boss refused to "tip" inspectors. Yet another plumber, Michael Brescia, testified that he "felt as though there would be some kind of problem" if he did not "tip" the inspectors.

The government also adduced evidence demonstrating that Appellants had knowledge that they were receiving the plumbers' payments in return for favorable exercise of government authority. At the time of hiring, plumbing inspectors were required to sign an ethics statement whereby they agreed not to "accept, nor offer any gift, favor or service that might tend to influence me in the discharge of my duties." There was testimony from a city personnel manager that every plumbing inspector hired between 1980 and 2000 – a time

24

period encompassing the dates of hire of each of the Appellants – was instructed that they were not permitted to take money. The personnel manager testified that the prohibition on taking money was reiterated at subsequent integrity training sessions. Coupled with the evidence concerning the prohibition on taking money was ample evidence that Appellants did not receive the plumbers' payments publicly, or at least openly in public. Rather, plumbers would conceal the payments inside the pages of a permit or would fold up cash and transfer it by way of a "green handshake."

Thus, the government adduced substantial evidence that: (1) plumbers made payments to Appellants knowing that Appellants were public officials exercising governmental authority; (2) plumbers, knowing of the discretion in the plumbing code and desirous of punctual inspections, made payments in order to assure advantageous exercise of that government authority by Appellants; and (3) Appellants knew that the plumbers' payments were made for an improper purpose, i.e., the influencing of their governmental authority. This evidence squarely supports the showing required to prove extortion "under color of official right" as explained by the Supreme Court in *Evans*. Contentions like Appellant Urban's that there was no evidence that he "failed to perform his job as a result of his being tipped and no one claimed to have tipped [him] in exchange for anything," or like Appellant Mulderig's that Appellants were not influenced by the plumbers' payments, even if accurate, are unavailing. We therefore find that Appellants have failed to meet the stringent standard for overturning their Hobbs Act convictions on grounds of insufficient evidence of extortion "under color of official right."

C.      Appellants' challenges to their RICO convictions.

Appellants O'Malley, Rachuba, Tursi and Urban contend that the government failed to prove that they directed the affairs of an "enterprise" as required to support a RICO conviction.  Appellants also argue that the government failed to prove the existence of an "enterprise" for purposes of their RICO convictions because the CSD cannot be such an "enterprise."  We reject these contentions.

Appellants were charged with violating § 1962(c) of RICO, which provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  "To establish a § 1962(c) RICO violation, the government must prove the following four elements:  '(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity.'" *United States v. Irizarry*, 341 F.3d 273, 285 (3d Cir. 2003) (quoting *United States v. Console*, 13 F.3d 641, 652-653 (3d Cir. 1993)).

Appellants contend that the government failed to prove that they directed the affairs of the CSD or participated in its operation or management.  In order to participate, directly or indirectly, in the conduct of an enterprise's affairs for purposes of § 1962(c), "one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  But "one need not hold a formal position within an enterprise in order to 'participate' in its affairs." *United States v. Parise*, 159 F.3d 790, 796 (3d Cir. 1998) (citing

26

*Reves*, 507 U.S. at 179). Moreover, "the 'operation or management' test does not limit RICO liability to upper management because 'an enterprise is operated not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management.'" *Parise*, 159 F.3d at 796 (quoting *Reves*, 507 U.S. at 184) (internal quotation marks omitted). *Reves* thus "made clear that RICO liability may extend to those who do not hold a managerial position within an enterprise, but who do nonetheless knowingly further the illegal aims of the enterprise by carrying out the directives of those in control." *Id.*

We have applied *Reves* to limit RICO liability under § 1962(c) to those instances where there is "'a nexus between the person and the conduct in the affairs of an enterprise.'" *Parise*, 159 F.3d at 796 (quoting *University of Maryland at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993)). The government's evidence sufficiently established the existence of such a nexus here simply by demonstrating that the City employed Appellants to perform plumbing inspections and related work, and that Appellants in fact performed that work.

Appellants also argue that the government failed to prove the existence of an "enterprise." RICO defines "enterprise" as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). In order to prove the requisite "enterprise," we require proof "(1) that the enterprise is an ongoing organization with some sort of framework for making or carrying out decisions; (2) that the various associates function as a continuing unit; and (3) that the enterprise be separate and apart from the pattern of activity in which it engages." *Irizarry*, 341 F.3d at 286 (citations omitted).

27

Here, the government adduced evidence establishing each of the three elements of "enterprise" set forth in *Irizarry*. There is no dispute that the CSD is "an ongoing organization with some sort of framework for making or carrying out decisions." In order to prove the second element – "associates function[ing] as a continuing unit" – we have said that the government must show "that each person perform[ed] a role in the group consistent with the organizational structure established by the first element and which furthers the activities of the organization." *United States v. Riccobene*, 709 F.2d 214, 223 (3d Cir. 1982), *overruled on other grounds by Griffin v. United States*, 502 U.S. 46 (1991)). Again, the government offered sufficient evidence to support this element. There is no question that Appellants worked for the "enterprise," i.e., the CSD, and they did so on a continuous basis, daily issuing permits and performing inspections of plumbing projects in Philadelphia. Finally, there is no dispute that the CSD was distinct from Appellants' extortionate acts. The CSD is an arm of the government of the City of Philadelphia created for the purpose of issuing permits for construction projects in Philadelphia and overseeing those projects to ensure their compliance with code regulations. There is no contention that the CSD was created and existed for the purpose of enabling Appellants' extortionate acts.

Appellants suggest that an "enterprise" can only be an "illegal organization," and that therefore "an employment group [like the CSD] created by the City is definitely not an enterprise." This misstates the law under RICO. The plain text of RICO defines enterprise as, *inter alia*, a "legal entity[.]" *See* 18 U.S.C. § 1961(4). And we have frequently found government entities to be "enterprises" for RICO purposes. *See, e.g., Genty v. Resolution Trust Corp.*, 937 F.2d 899, 906-07 (3d Cir. 1991) (holding that township can be an "enterprise" for RICO purposes) (citation omitted); *Averbach v. Rival Mfg. Co.*, 809 F.2d 1016, 1018 (3d Cir. 1987) (noting that court can

28

be an "enterprise"); *United States v. Bacheler*, 611 F.2d 443, 450 (3d Cir. 1979) (holding that Philadelphia Traffic Court can be an "enterprise"); *United States v. Frumento*, 563 F.2d 1083, 1092 (3d Cir. 1977) (holding that the Pennsylvania Department of Revenue's Bureau of Cigarette and Beverage Taxes was an "enterprise").

Finally, Appellants assert that the government failed to prove an agreement among Appellants to participate in an enterprise through a pattern of racketeering activities. But Appellants were charged with committing substantive RICO violations under 18 U.S.C. § 1962(c), which does not require proof of any such agreement. *See Parise*, 159 F.3d at 794 (citation omitted). Accordingly, we find that the government adduced sufficient evidence to support Appellants' RICO convictions, and will therefore affirm those convictions.

D.      Appellants' challenges to the sufficiency of the indictment and the District Court's denial of their motions for a bill of particulars.

Appellants Jackson, O'Malley, Rachuba and Tursi argue that the indictment failed to allege sufficient information enabling them to prepare a defense. They also contend that given the insufficiency of the indictment, the District Court erred in denying their motion for a bill of particulars. We reject these challenges.

We deal first with the sufficiency of the indictment. We exercise plenary review over a challenge to the sufficiency of an indictment. *United States v. Whited*, 311 F.3d 259, 262 (3d Cir. 2002) (citation omitted). An indictment must contain "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "We consider an indictment sufficient if, when considered in its entirety,

29

it adequately informs the defendant of the charges against her such that she may prepare a defense and invoke the double jeopardy clause when appropriate." *Whited*, 311 F.3d at 262 (citations omitted).

The indictment here tracked the language of the Hobbs Act, stating that Appellants "knowingly and unlawfully obstructed, delayed and affected commerce, and the movement of articles and commodities in commerce, and attempted to do so, by extortion" by "unlawfully obtain[ing] and attempt[ing] to obtain property and things of value." The indictment further identified in chart form the approximate dollar amounts of the "things of value" (the payments taken by Appellants) as well as the persons and businesses who made the payments. In other words, the indictment informed Appellants of the statute they were charged with violating, the elements of a violation of that statute, the persons or businesses victimized, and the time period during which the payments were made. As such, the indictment more than adequately informed Appellants of the charges leveled against them, and enabled them to prepare their defense and, if applicable, invoke the double jeopardy clause.

We also disagree with Appellants' contention that the District Court erred in denying their motions for a bill of particulars. We review an order denying a motion for a bill of particulars for abuse of discretion. *See United States v. Eufrasio*, 935 F.2d 553, 575 (3d Cir. 1991) (citation omitted). A bill of particulars is a "formal, detailed statement of the claims or charges brought by a plaintiff or a prosecutor[.]" Black's Law Dictionary 177 (8th ed. 2004). The purpose of a bill of particulars is "to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." *Addonizio*, 451 F.2d at 63-64. Only where an indictment fails to perform these functions, and thereby "significantly impairs the

30

defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial[,]" *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989) (citing *Addonizio*, 451 F.2d at 62-63), will we find that a bill of particulars should have been issued.

As discussed above, the indictment provided more than enough information to allow Appellants to prepare an effective trial strategy. Moreover, Appellants had access through discovery to the documents and witness statements relied upon by the government in constructing its case, including trial evidence reflecting the dates of payments to Appellants and the approximate amounts of those payments.[4] This access to discovery further weakens the case for a bill of particulars here. *See United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979) ("Full discovery ... obviates the need for a bill of particulars."). The District Court therefore did not abuse its discretion in denying Appellants' motions for a bill of particulars.

E.      Appellant Leone's challenge to the District Court's admission of videotapes produced by hidden cameras installed in city vehicles.

At trial, the government entered into evidence several videotapes produced by cameras hidden inside city vehicles used by Appellants, including Appellant Leone. Appellant Leone unsuccessfully moved to suppress the videotapes, and argues on

---

[4]This evidence apparently included a computer program prepared by the government and provided to Appellants which enabled Appellants to determine how many inspections each inspector performed for each plumber during a specific time period, and to identify which of the inspectors had inspected the work of which plumbers who had stated that they made payments to inspectors.

appeal that the District Court erred in refusing to grant his suppression motion. For the reasons that follow, we will affirm the District Court's denial of Appellant Leone's suppression motion.

In February 2000, the government sought an order from the District Court "to utilize CTV (no audio) to videotape the activities of the targeted plumbing inspectors in two City of Philadelphia vehicles while performing their daily work routine." The affidavit submitted by the government in support of its request contained statements given by several confidential sources during interviews with the FBI. These statements detailed a relatively widespread practice by plumbing inspectors, including Appellants, of accepting cash payments from plumbers whose work they inspected. On February 18, 2000, on the basis of the government's affidavit, the Honorable William H. Yohn of the United States District Court for the Eastern District of Pennsylvania issued an order authorizing the interception of visual, non-verbal conduct and activities pursuant to Rule 41(b) of the Federal Rules of Criminal Procedure and the All Writs Act, 28 U.S.C. § 1651. Judge Yohn found that there was probable cause to believe that Appellants, among others, were committing Hobbs Act violations, and found that there was probable cause to believe that particular visual, non-verbal conduct and activities concerning these offenses would be obtained through video surveillance installed in the vehicles. Judge Yohn ordered that the interception end on the earlier of (a) thirty days from the date of the order or (b) when intercepted conduct or activity "reveals the manner in which these individuals and others as yet unknown participate in the specified offenses and reveals the identities of their coconspirators, their methods of operation, and the nature of the conspiracy[.]" Judge Yohn granted several subsequent applications by the government to extend the order beyond the original thirty days.

32

While on official inspection duty, Appellant Leone drove one of the cars in which a video camera had been installed. The video camera captured numerous instances of Appellant Leone taking money from plumbers that had been placed between the pages of permits and putting it into his pocket despite not conducting any inspection of the project site. Appellant Leone argues that there was not probable cause supporting the order authorizing the installation of the video cameras because the only information supporting the order was not particularized as to him as required by the Fourth Amendment.[5] He also argues that the information contained in the government's affidavit did not create constitutionally sufficient probable cause because it was stale, i.e., too much time had elapsed between the dates referenced by the confidential sources and the District Court's order authorizing the installation of the video cameras.

Appellant Leone's contentions fail. Neither the Fourth Amendment nor the federal wiretap statute, Title III of the federal Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520,[6] proscribes the interception and use of audio or visual data of persons not specifically named in an application seeking judicial authorization of such interception. *See United States v. Donovan*, 429 U.S. 413, 435 (1977) ("It is not a constitutional

---

[5]Leone contends that the government "agrees" that he "had a reasonable expectation of privacy in his work vehicle." Nothing in the government's brief undermines this statement. Thus, we will assume that the operation of the video cameras installed in the vehicles amounted to a Fourth Amendment search and seizure requiring the existence of probable cause.

[6]We have assumed that Title III applies to video surveillance. *See United States v. Williams*, 124 F.3d 411, 416 (3d Cir. 1997).

33

requirement that all those likely to be overheard engaging in incriminating conversations be named."); *United States v. Kahn*, 415 U.S. 143, 152-53 (1974) (rejecting interpretation of Title III requiring application for judicial authorization to "identify all persons, known or discoverable, who are committing the offense and whose communications are to be intercepted.") (internal quotation marks omitted); *United States v. Tehfe*, 722 F.2d 1114, 1117-18 (3d Cir. 1983).[7]  As the Supreme Court explained in *Donovan*, so long as electronic interception is justified by probable cause that the facility or property through or at which the intercepted communication takes place is the means or situs of criminal activity, "the failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization." *Donovan*, 429 U.S. at 435.

Our decision in *Tehfe* illustrates these principles.  It involved a wiretap on a phone at an address denoted "22nd Street."  The

---

[7]Our sister circuits agree.  *See, e.g., United States v. Killingsworth*, 117 F.3d 1159, 1165 (10th Cir. 1997) (rejecting contention that recording conversations of persons unidentified in application for wiretap authorization violated Title III); *United States v. Martin*, 599 F.2d 880, 884 (9th Cir. 1979), *overruled on other grounds by United States v. DeBright*, 730 F.2d 1255 (9th Cir. 1984) ("There is no constitutional requirement that the persons whose conversations may be intercepted be named in the application.") (citing *Donovan*, 429 U.S. at 427 n.15); *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir. 1978) ("[W]e have never required that a defendant be named in a wiretap application or accused of using the suspected telephone before evidence obtained by the wiretap can be used against him.  One of the objects of wiretapping is to ascertain the full extent of participation in criminal activity, and we need not limit retrospectively the pool of potential defendants.").

affidavit supporting the wiretap detailed a drug distribution ring that included defendant Tehfe as one of its principals and sought authorization to tap the phone of defendant Sanchez at 22nd Street. The affidavit arguably did not specifically identify Sanchez as belonging to or participating in the drug ring at issue. The wiretap produced information supporting Sanchez's arrest. The district court granted Sanchez's motion to suppress that information, noting that the application seeking the wiretap did not contain evidence specifically linking him to the illegal drug activity. We reversed, explaining in pertinent part:

> When reviewing an application, courts must also bear in mind that search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found. *Zurcher v. Stanford Daily*, 436 U.S. 547, 553-560, 98 S. Ct. 1970, 1975-1978, 56 L.Ed.2d 525 (1978). The affidavit in support of a warrant need not present information that would justify the arrest of the individual in possession of or in control of the property. Nor is it required that the owner be suspected of having committed a crime. Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant.

722 F.2d at 1117-18 (citation omitted). We then applied these Fourth Amendment principles in *Tehfe* to wiretap authorizations, focusing not on the persons specifically identified as participants in the illegal activity, but rather on the facility (the 22nd Street phone) employed to further that illegal activity. *Id.* at 1118.

35

The principles expounded in *Tehfe* apply squarely here. Just as there was no question that probable cause existed that the 22nd Street phone line was being used for criminal purposes, there is no question here that probable cause existed that plumbing inspectors were accepting cash payments from plumbers on inspection sites. The Fourth Amendment and Title III require nothing more.

Appellant Leone's staleness argument fails as well. He argues that the only information supporting probable cause as to him were CS1's statements concerning what he witnessed as a plumbing inspector from 1992-1997. In his view, this information could not support probable cause on February 18, 2000, more than two years after the conclusion of the time period providing the basis for CS1's testimony. It is true that the "[a]ge of the information supporting a warrant application is a factor in determining probable cause[,]" *United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002) (citations omitted), and that "[i]f too old, the information is stale, and probable cause may no longer exist." *Id.* (citation omitted). But "[a]ge alone ... does not determine staleness. 'The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant.'" *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993) (quoting *United States v. Williams*, 897 F.2d 1034, 1039 (10th Cir. 1990)). "Rather, we must also examine the nature of the crime and the type of evidence." *Id.* (citations omitted). Thus, where the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance. *See Tehfe*, 722 F.2d at 1120; *United States v. Harris*, 482 F.2d 1115, 1119 (3d Cir. 1973) ("where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant.") (citation and internal quotation marks

36

omitted). "[T]he liberal examination given staleness in a protracted criminal conduct case 'is even more defensible in wiretap cases than in ordinary warrant cases, since no tangible objects which can be quickly carried off are sought.'" *Tehfe*, 722 F.2d at 1119-20 (citation omitted).

When analyzed under these standards, the evidence advanced by the government in support of its request for authorization of the hidden cameras was not stale. The confidential sources cited in the government's affidavit depicted the acceptance of payments not only as a routine and continuous practice from 1992-1997, but, as evidenced by CS1's statements concerning Appellant Tursi's extortion in April of 1999, and payments made to inspector O'Donnell from April to October 1999, also as a practice that continued beyond 1997 into late 1999. In other words, there was evidence that the plumbing inspectors' misconduct was an established, routine practice that had spanned numerous years and had continued at least up until just months prior to the District Court's initial authorization of the video surveillance in February of 2000. We therefore conclude that the evidence of the plumbing inspectors' continuous misconduct leading up to the time of the first affidavit's issuance was not stale, and therefore provided probable cause for the video surveillance.

F.      Appellant Rachuba's challenge to the District Court's denial of his motion to sever his trial from the trial of the other Appellants.

Appellant Rachuba contends that the District Court abused its discretion in refusing to sever his trial from that of the other Appellants because the evidence against certain of the other Appellants "was voluminous and more aggressive in nature" than that marshaled against him, and "created an unavoidable spillover effect

37

continually prejudicing Rachuba and denying him a fair trial." We disagree.

We begin with the fundamental principle that the federal system prefers "joint trials of defendants who are indicted together [ ]" because joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). For this reason, the choice of whether to sever is reserved "to the sound discretion of the district courts." *Zafiro*, 506 U.S. at 541. We therefore review a District Court's denial of a motion for severance for abuse of discretion. *United States v. Hart*, 273 F.3d 363, 369 (3d Cir. 2001). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

Defendants seeking to sever bear a "heavy burden," *Console*, 13 F.3d at 655, and must demonstrate not only abuse of discretion in denying severance, *id.*, but also that the denial of severance would lead to "clear and substantial prejudice resulting in a manifestly unfair trial." *United States v. Palma-Ruedas*, 121 F.3d 841, 854 (3d Cir. 1997), *rev'd on other grounds by United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999). "[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540. "Mere allegations of prejudice are not enough." *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981).

Appellant Rachuba has failed to meet his burden. His argument boils down to the contention that the evidence of payments accepted by other Appellants enhanced his own guilt in the view of

the jury. We have long held, however, that "'[a] defendant is not entitled to severance merely because the evidence against a co-defendant is more damaging than that against him.'" *United States v. Adams*, 759 F.2d 1099, 1112 (3d Cir. 1985) (quoting *United States v. Dansker*, 537 F.2d 40, 62 (3d Cir. 1976)). *See also Console*, 13 F.3d at 655 ("Prejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant or some evidence adduced is more damaging to one defendant than others.") (citation and internal quotation marks omitted). Rather, "[s]ome exacerbating circumstances, such as the jury's inability to 'compartmentalize' the evidence, are required." *Adams*, 759 F.2d at 1112-13 (quoting *Dansker*, 537 F.2d at 62). The jury here was fully capable of compartmentalizing the evidence against the various Appellants. The jury had at its disposal a chart which specified which of the Appellants accepted bribes from which plumbers, thus enabling it to effectively segregate the evidence adduced against Rachuba from that adduced against the other Appellants. Moreover, the District Court expressly instructed the jury to compartmentalize the evidence, stating in its instructions that "the fact that you may find a defendant guilty or not guilty of one of the offenses should not control your verdict as to any of the other offenses charged," and that "you must give separate and individual consideration to each charge against each defendant." We presume that the jury follows such instructions, *see Zafiro*, 506 U.S. at 540, and regard such instructions as persuasive evidence that refusals to sever did not prejudice the defendant. *See, e.g., United States v. Voigt*, 89 F.3d 1050, 1096 (3d Cir. 1996) (finding that similar limiting instructions "reinforce[d]" its affirmance of the district court's denial of motion to sever) (citations omitted).[8] For these

---

[8]The case before us closely resembles *United States v. Garner*, 837 F.2d 1404 (7th Cir. 1987). There, City of Chicago sewage inspectors had been charged with accepting bribes from private

39

reasons, we conclude that the District Court did not abuse its discretion in denying Appellant Rachuba's motion for severance.

G.      Appellant Rachuba's contention that the District Court erred in refusing to grant a mistrial due to jurors' inadvertent exposure to media.

Appellant Rachuba contends that the District Court abused its discretion when it refused to grant a mistrial because jurors were inadvertently exposed to a New York Times article discussing a federal bribery case involving New York City plumbing inspectors, as well as a Philadelphia Inquirer article reporting about guilty verdicts handed down in a contemporaneous, though unrelated, corruption trial in the same federal courthouse. The New York Times article had been attached to a memorandum entered into evidence during the testimony of the L&I Department's Administrative Services Director, Richard Feldgus. The memorandum, issued by L&I Department Commissioner Bennet Levin in 1993, addressed

---

contractors in violation of RICO and the Hobbs Act. The inspectors were convicted following a joint trial and appealed, among others, the District Court's refusal to sever their trials. The Seventh Circuit affirmed the District Court's refusal to sever. The court noted that, as here, the evidence adduced against the sewage inspectors consisted almost entirely of testimony by contractors concerning the identity of those inspectors they bribed. 837 F.2d at 1414. As such, though the amount of evidence was large, it was not complex, and thus "the jury was able to 'segregate the evidence into separate intellectual boxes' and to 'compartmentalize the evidence against the defendants.'" *Id.* (quoting *United States v. Cavale*, 688 F.2d 1098, 1106, 1108 (7th Cir. 1982)). Furthermore, as here, "the jury was instructed carefully to give the defendants separate consideration, and to ignore the evidence against the other defendants." *Id.*

40

corruption in city government and warned city employees not to take any additional money beyond their city remuneration. The government asked Feldgus during his testimony to read from the memorandum. Defense counsel objected to the government's anticipated introduction of the article, and the District Court sustained the objection, precluding the article's admission. The District Court further instructed the jury not to read the article and ordered the government to remove the article from the jury evidence books. The District Court refused to dismiss any of the jurors following a voir dire during which it questioned them about the extent to which they had read the New York Times article.

On the day the Philadelphia Inquirer article was printed, Appellant Leone's counsel, joined by, among others, Appellant Rachuba's counsel, moved for a mistrial because he believed at least some of the jurors had read the article. As with the New York Times article, the District Court conducted a voir dire of the jurors during which it asked them whether they had read about or discussed any other federal case reported in the news and, at least as to one juror who had specifically read the Inquirer article, whether having read or heard any such report would affect his impartiality. Following the voir dire, the District Court denied the motion for a mistrial based on exposure to the Inquirer article.

"We review a district court's order which denies a new trial based on alleged prejudicial information for abuse of discretion." *Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir. 1993) (citing *Gov't of Virgin Islands v. Lima*, 774 F.2d 1245, 1250 (3d Cir. 1985)). "A new trial is warranted if the defendant likely suffered 'substantial prejudice' as a result of the jury's exposure to the extraneous information." *United States v. Lloyd*, 269 F.3d 228, 238 (3d Cir. 2001) (quoting *United States v. Gilsenan*, 949 F.2d 90, 95 (3d Cir. 1991)). "In examining for prejudice, we must conduct 'an objective

41

analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror.'" *Lloyd*, 269 F.3d at 238 (quoting *Gilsenan*, 949 F.2d at 95 (internal citations omitted)). We look to see whether the allegedly prejudicial information influenced the jury "when it deliberated and delivered its verdict, as we are concerned with the information's effect on the verdict rather than the information in the abstract." *Gilsenan*, 949 F.2d at 96. The party seeking the new trial bears the burden of demonstrating a likelihood of prejudice. *Waldorf*, 3 F.3d at 710. "We independently review the record to determine if that party has met that burden." *Lloyd*, 269 F.3d at 238 (citing *Gilsenan*, 949 F.2d at 95).[9]

In determining prejudice, we have often looked at numerous factors, including the "extent of the jury's exposure to the extraneous information[,]" *Lloyd*, 269 F.3d at 240 (citations omitted), the "time at which the jury receives the extraneous information[,]" *id.*, "the length of the jury's deliberations and the structure of its verdict[,]" *id.*

---

[9]As we explained in *Lloyd*, unlike many other circuits, we do not mechanically apply a presumption of prejudice every time a jury is exposed to extraneous information. *See Lloyd*, 269 F.3d at 238. Rather, while we tend to apply the presumption of prejudice where a juror is directly contacted by third-parties, *Lloyd*, 269 F.3d at 238 (citing cases), "we tend not to apply the presumption to circumstances in which the extraneous information at issue is a media report, such as a television story or newspaper article." *Id.* at 239 (citing cases). It is true that even in the case of media exposure, we will apply the presumption of prejudice where "the publicity that occurs is [ ] fundamentally prejudicial... ." *Waldorf*, 3 F.3d at 710 n.6. But no such presumption applies "[w]here the improper publicity is of a less serious nature... ." *Id.* (citation omitted). We find that the articles at issue here are not "fundamentally prejudicial," and therefore do not apply any presumption of prejudice.

42

at 241, and the existence of instructions from the court that the jury should consider only evidence developed in the case. *Id*. The District Court's voir dire of the jurors revealed that their exposure to the two articles was limited to nonexistent. Eleven of the sixteen jurors responded that they had not read the New York Times article, one juror responded that he had the read the entire article, and the remaining jurors responded that they had either just looked at the picture on the first page of the article or glanced at the article's contents. Only two of the jurors said that they had read the Inquirer article. The District Court's voir dire of the jurors reveals that the exposure of the jurors to the article was limited to non-existent, thus supporting the absence of prejudice.

Second, the jury was exposed to the New York Times article on the third day of a seventeen-day trial, approximately four weeks before it would deliberate. This length of time between exposure and deliberation dilutes any prejudice resulting from that article. *See Gilsenan*, 949 F.2d at 96 (finding relevant to its conclusion that no prejudice ensued the fact that the allegedly prejudicial information "was received at the outset of the trial and was followed by a mass of evidence delivered over a 24-day, six-week period.").

Third, as in *Gilsenan*, the jury here delivered a "fractured verdict showing that it carefully delineated among the offenses and between the appellants[,]" *id.*, thus further supporting the absence of prejudice resulting from the two articles. The jury convicted Appellant Jackson of Hobbs Act extortion but acquitted him on the RICO charge. Moreover, while the jury convicted Appellants of several Hobbs Act extortion counts, it acquitted them on several others, particularly significant in this context given the multiple defendants and high number of individual counts.

43

Finally, the District Court specifically instructed the jury that it should consider only evidence presented at trial, that it must disregard any evidence as to which an evidentiary objection was sustained, and, specifically, that it must ignore the New York Times article. This, also, militates against a finding of prejudice. *See Gilsenan*, 949 F.2d at 96 (deeming relevant to finding of no prejudice the fact that the "jury was instructed to decide the case on the basis only of the evidence and not extrinsic information") (citation omitted).

In light of the limited exposure of the jurors to the articles, the early juncture of the trial at which any exposure to the New York Times article took place, the length of time intervening between exposure to the New York Times article and deliberation, the fractured verdict, and the District Court's instructions admonishing the jury not to consider stricken evidence generally, and the New York Times article specifically, we find that Appellant Rachuba has failed to carry his burden of establishing prejudice, and that the District Court therefore did not abuse its discretion in refusing to grant his motion for a new trial on this basis.

H.      Appellants' challenges regarding certain jury instructions given and not given.

Appellants Jackson, O'Malley, Rachuba and Tursi challenge the propriety of the District Court's refusal to incorporate numerous jury instructions proposed by those Appellants. Appellant Leone challenges the District Court's instruction relating to the Hobbs Act charge against him, arguing that the instruction precluded his defense that the payments he accepted were gratuities, not bribes. We reject all of these asserted points of error.

44

Where the challenge to a jury instruction is a challenge to the instruction's "statement of the legal standard, we exercise plenary review." *United States v. Zehrbach*, 47 F.3d 1252, 1260 (3d Cir. 1995) (citations omitted). Otherwise, we review challenges to jury instructions for abuse of discretion. *Id.* at 1264 (citations omitted). In so doing, we consider "whether, viewed in light of the evidence, the charge as a whole fairly and adequately submits the issues in the case to the jury." *Id.* (quoting *Bennis v. Gable*, 823 F.2d 723, 727 (3d Cir. 1987)). Refusal to give a proposed instruction is reversible error "only if the omitted instruction is correct, is not substantially covered by other instructions, and is so important that its omission prejudiced the defendant." *United States v. Davis*, 183 F.3d 231, 250 (3d Cir. 1999) (citing *United States v. Smith*, 789 F.2d 196 (3d Cir. 1986)).

Appellants Jackson, O'Malley, Rachuba and Tursi argue that the District Court erred in refusing to give sixteen instructions which Appellants proposed. We address each of these proposed instructions in turn. Appellants requested that the following be charged with respect to the RICO charge:

> In order to find a defendant guilty, your focus is on the agreement to participate in the enterprise through a pattern of racketeering activity, not on the agreement to conduct individual predicate acts.

Appellants also requested a charge that they must have "knowingly agree[d] to participate in the enterprise." None of this language was appropriate because it speaks to RICO conspiracy, but the government had not charged Appellants with RICO conspiracy under 18 U.S.C. § 1962(d); as discussed above, it charged Appellants with substantive RICO violations under 18 U.S.C. § 1962(c), and the government need not prove any agreement in order to prove a § 1962(c) violation. *See Irizarry*, 341 F.3d at 285 (listing four

45

elements of § 1962(c) violation). The language used to express the § 1962(c) charge was fully accurate.

Next, Appellants contend that the District Court should have issued the following charge:

> The Hobbs Act requires that the defendant induce victims to part with their property; that they do so through the use of fear, and that they adversely affect interstate commerce.

This language is taken almost verbatim from our decision in *Addonizio*, 451 F.2d 49, 59 (3d Cir. 1972). But as the government points out, the theory of Hobbs Act extortion in *Addonizio* was extortion based on fear of economic injury. *See United States v. Kenny*, 462 F.2d 1205, 1229 (3d Cir. 1972) (noting that in *Addonizio*, "the case was submitted to the jury only on a use of fear theory."). As we explained above, the Hobbs Act criminalizes two separate classes of extortionate conduct: "extortion induced by 'wrongful use of force' and extortion 'under color of official right.'" *Antico*, 275 F.3d at 255. Here, the government advanced a theory of Hobbs Act extortion under the latter class, i.e., extortion "under color of official right." We have made clear that the "under color of official right" class of Hobbs Act extortion does not "require proof of threat, fear, or duress." *Kenny*, 462 F.2d at 1229 (citations omitted); *see also Mazzei*, 521 F.2d at 645 ("A violation of the [Hobbs Act] may be made out by showing that a public official through the wrongful use of office obtains property not due him or his office, even though his acts are not accompanied by the use of 'force, violence or fear.'") (citation omitted). Thus, the District Court's refusal to accept Appellants' "fear" instruction was entirely appropriate.

Appellants requested a number of instructions pertaining to the effect on commerce element under the Hobbs Act. They first requested a charge that there must be a "substantial" connection to interstate commerce. But we expressly rejected this language in *Clausen*, where we held that "proof of a *de minimis* effect on interstate commerce is all that is required" to establish the Hobbs Act's effect on commerce requirement. *See Clausen*, 328 F.3d at 711 (citation omitted). Appellants also requested several instructions purporting to describe the depletion of assets theory of proving the effect on commerce element. While much of the suggested language in these requested instructions was accurate, the charge actually given by the District Court[10] accurately expressed the depletion of assets theory, thus precluding any finding of reversible error in the failure to give Appellants' alternative formulations.

Appellants requested two instructions purporting to define "extortion" under the Hobbs Act. The first stated that "[w]hen contributions are made to public officials, the government must prove that the payments are made only in return for an explicit promise or undertaking by the official to perform or not perform an official act." The second stated that in order to prove Hobbs Act extortion, the government had to "prove that the public official knew that he was

_____

[10]Specifically, the District Court charged:

Payment from a business engaged in interstate commerce satisfies the requirement of an effect on interstate commerce. If the resources of a business are expended or diminished as a result of the payment of money, then interstate commerce is affected by such payment and may reduce the assets available for purchase of goods, services, or other things originating in other states.

47

being offered payment in exchange for a specific requested exercise of his official power." The District Court correctly refused both, as they misstate the law. *See Evans*, 504 U.S. at 268 ("the [g]overnment need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts"); *United States v. Bradley*, 173 F.3d 225, 231 (3d Cir. 1999) (stating that "a conclusion that in a Hobbs Act case the government has to demonstrate that the public official made an express promise to perform a particular act and that 'knowing winks and nods' are not sufficient would frustrate the [Hobbs A]ct's effect.") (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring)). At the same time, the language actually employed by the District Court was, once again, completely aligned with the law of this Circuit. The District Court charged the jury that "an explicit promise to perform the official acts in return for payment is not required," language virtually identical to the instruction we approved in *Bradley*. *See Bradley*, 173 F.3d at 231 ("the government does not have to prove that there was an express promise on the part of the public official to perform a particular act at the time of the payment") (quoting instruction). The District Court further charged that "[e]xtortion occurs if the official knows that the payment or benefit is motivated by a hope that it will influence him in the exercise of his office, or influence any action that he takes because of his official position, and if, knowing this, he accepts or agrees to accept the payment or benefit." This, also, comports with our jurisprudence. *See Antico*, 275 F.3d at 256-58.

Appellants requested three final instructions relating to the Hobbs Act charge. First, they asked the District Court to charge that "mere voluntary payment of money does not constitute extortion." It is true that purely voluntary payments do not rise to the level of Hobbs Act extortion. But this proposed instruction added nothing to the fully accurate and complete instruction given by the District Court

48

defining Hobbs Act extortion, some of which was discussed in the immediately preceding paragraph. *See also* App. 3177a (District Court's instruction further charging jury that "the use of one's office to obtain money or services not due is extortion."). The District Court's instructions sufficiently described Hobbs Act extortion under color of official right, and their failure to include the "voluntary payments" language proposed by Appellants was therefore not error.

Appellants then asked the District Court to charge that "[t]he prosecution is required to prove that a defendant who accepts money wrongfully used his office to induce the payments he received[,]" and prove "that a public official did something, under color of his public office, to cause the giving of benefits." However, inducement is not an element of Hobbs Act extortion where the defendant is a public official. *See Antico*, 275 F.3d at 256 ("the word 'induced' is a part of the definition of the offense by the private individual, but *not* the offense by the public official.... The statute merely requires of the public official that he obtain 'property from another, with his consent, ... under color of official right.'") (quoting *Evans*, 504 U.S. at 265) (some internal quotation marks omitted) (emphasis added). Nor is the government required to prove that the public official defendant actually "did something" to cause the payment, not only because, as just explained, proof of inducement by the public is not required, but also because proof of an explicit *quid pro quo* is not required. *Id.* at 259 (so long as public official knows "that payments or other consideration were extended to him to secure unwarranted favorable treatment in his official capacity, he is guilty of Hobbs Act extortion under color of official right without the need to prove that the official action (or inaction) occurred.").

The final Hobbs Act instruction proposed by Appellants was that "in order to find the defendants guilty of extortion, you must find that gifts given and received were of significant value." There is no

49

support in our precedent for the requirement that payments made be "significant" in value. In fact, under *Clausen*, the government need only prove a *de minimis* effect on commerce; by necessary implication, insignificant payments having only a *de minimis* effect on commerce are therefore sufficient.

Appellants contend that the District Court erred in refusing to give two proposed instructions pertaining to the RICO charge. The first charged the jury that the prosecution must prove "[s]ome type of organizational structure" in order to establish the existence of a RICO "enterprise." RICO and our precedent merely require proof of an "enterprise," and the District Court set forth how RICO and our precedent defines such an "enterprise." There is no independent requirement that the government prove any particular type of "organizational structure" within the "enterprise." The second proposed instruction charged that "[a]n enterprise must be comprised of defendants only[]," citing as support *United States v. Nabors*, 45 F.3d 238 (8th Cir. 1995). But *Nabors* does not support the proposed charge. *Nabors* held that a RICO "enterprise" *may* be comprised only of defendants, not that it *must* be comprised of defendants only. *See Nabors*, 45 F.3d at 240-41 (citation omitted). The operative inquiry is whether the alleged "enterprise" is distinct from the alleged "pattern of activity in which it engages" – so long as it is distinct, and otherwise meets the broad statutory definition of "enterprise," it may be comprised only of defendants, or of defendants and non-defendants.

Appellants O'Malley and Leone make two final arguments with respect to jury instructions. Following Appellant O'Malley's testimony at trial, his counsel asked that the District Court charge the jury that "[a]s a jury, you may not infer defendant's [i.e., O'Malley's] guilt from any disbelief of his testimony." The government contends that this requested charge misstates the law. Indeed, there is no

50

question "that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)) (other citations omitted); *see also Wilson v. United States*, 162 U.S. 613, 620-21 (1896) (stating that there could be no "question that, if the jury were satisfied, from the evidence, that false statements in the case were made by defendant, or on his behalf, at his instigation, they had the right, not only to take such statements into consideration, in connection with all the other circumstances of the case, in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense, made or procured to be made, as in themselves tending to show guilt."); *United States v. Jocic*, 207 F.3d 889, 893 (7th Cir. 2000) ("When a defendant decides to testify and deny the charges against him and the finder of fact thinks he is lying, his untruthful testimony becomes evidence of guilt to add to the other evidence.") (citing *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir. 1991)). If the suggested charge had said that the jury "may not infer defendant's guilt *solely* from any disbelief of his testimony[,]" this would at least have been a correct statement of the law, for "discredited testimony is not considered a *sufficient* basis for drawing a contrary conclusion." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984) (citing *Moore v. Chesapeake & Ohio R. Co.*, 340 U.S. 573, 575 (1951)) (emphasis added); *see also United States v. Reed*, 297 F.3d 787, 789 (8th Cir. 2002) ("the government may not rely solely on the jury's disbelief of a defendant's denials to meet its burden of proof.") (citations omitted); *United States v. Aulicino*, 44 F.3d 1102, 1114-15 (2d Cir. 1995) ("a verdict of guilt cannot properly be based solely on the defendant's denial of the charges and the jury's disbelief of his testimony."). But this was not the language employed in the proposed

51

charge. The proposed charge was incorrect as a matter of law, and the District Court was right not to include it.

Appellant Leone contends that the Hobbs Act charge, by stating that "[p]assive acceptance of a benefit by a public official is sufficient basis for this type of extortion[,]" had the effect of "improperly eliminat[ing] the possibility that a public official may receive an unsolicited gratuity that does not constitute a Hobbs Act violation." Read in isolation, the "passive acceptance" language does give us some pause. In reviewing the legal accuracy of jury instructions, however, we read the instructions as a whole and in context. *See United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995). Doing so here reveals that the Hobbs Act instructions as a whole did not allow for the possibility that Appellant Leone was convicted on proof that he accepted an unsolicited, voluntary payment. The Hobbs Act charge required the government to prove that Appellants accepted payment "knowing that the payment was made in return for taking, withholding, or influencing official acts." The Hobbs Act charge also provided that "[e]xtortion occurs if the official knows that the payment or benefit is motivated by a hope that it will influence him in the exercise of his office, or influence any action that he takes because of his official position, and if knowing this, he accepts or agrees to accept the payment or benefit." These aspects of the Hobbs Act charge accurately describe Hobbs Act extortion, and adequately informed the jury notwithstanding Leone's contention.

I.      *United States v. Booker*, 125 S. Ct. 738 (2005).

Most of the Appellants have challenged their sentences under *United States v. Booker*, 125 S. Ct. 738 (2005).[11]  Having determined that these sentencing challenges are best addressed by the District Court in the first instance, we vacate Appellants' sentences and remand for resentencing in accordance with *Booker*.

III.

For the foregoing reasons, we will affirm the judgments of conviction as to each of the Appellants, but vacate the judgments of sentence of each of the Appellants[12] and remand to the District Court for resentencing.

---

[11]Appellants O'Malley and Tursi also argue that the District Court committed a sentencing error in fixing their base offense level under the sentencing guidelines for the RICO convictions.  Because we are vacating O'Malley's and Tursi's sentences and remanding to the District Court for resentencing under *Booker*, we will not address this particular challenge to their sentences here.

[12]We will vacate the sentences of Appellants Jackson, Rachuba and Tursi even though they have not expressly indicated that they wish to challenge their sentences under *Booker*.