NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-2017

_____

UNITED STATES OF AMERICA

v.

JAMES WALKER
also known as
CANDY

James Walker,
Appellant

_____

No. 06-2629

_____

UNITED STATES OF AMERICA

v.

KABONI SAVAGE
a/k/a
YUSEF BILLA
a/k/a
JOSEPH AMILL
a/k/a
BONNIE, BON, B,

Kaboni Savage,
Appellant

No. 06-3062

UNITED STATES OF AMERICA

v.

STEVE NORTHINGTON
also known as
POLICE OFFICER KEVIN LEWIS
also known as
"SMOKE"
also known as
MICHAEL TILLERY
also known as
SYEED BURHANNON

Steven Northington,
Appellant

No. 06-3359

UNITED STATES OF AMERICA

v.

DEREK RUSSELL
also known as
FLY

Derek Russell,
Appellant

2

No. 06-4509

UNITED STATES OF AMERICA

v.

MELVIN STEIN,
                        Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action Nos. 04-cr-00269-012/001/006/016/009)
District Judge: Honorable Mary A. McLaughlin

Submitted Under Third Circuit LAR 34.1(a)
June 10, 2010

Before: AMBRO, CHAGARES, and GREENAWAY, JR., Circuit Judges

(Opinion filed    August 30, 2010 )

OPINION

AMBRO, Circuit Judge

Derek Russell, Steven Northington, James Walker, and Kaboni Savage appeal

their convictions and sentences; Melvin Stein challenges his conviction. For the reasons

that follow, we affirm each.

### I. Factual Background and Procedural History

As we write only for the parties, we do not restate the facts in detail. The five defendants bringing this appeal, along with 15 others, were charged with various counts of drug trafficking, money laundering, and firearms offenses. The charges arose from a cocaine and crack cocaine organization run by Savage that operated in Philadelphia in the late 1990s and early 2000s. This was a large-scale operation: Savage's organization would "re-compress" kilogram quantities of cocaine to decrease the purity, and increase the quantity, of the cocaine they sold.

Savage led the organization with Gerald Thomas, who was indicted with Savage but died before trial. Three of the defendants-appellants—Russell, Northington, and Walker—distributed drugs for the Savage-Thomas operation. The fifth defendant-appellant, Stein, was a local realtor who helped the drug organization launder its proceeds.[1]

A large portion of the Government's investigation (and the evidence at trial) involved a wiretap of Thomas's cell phone, which captured thousands of incriminating phone calls. To support its allegations further, the Government conducted physical surveillance, executed search warrants, gathered telephone records, and secured the testimony of cooperating witnesses (including charged co-conspirators that pled guilty). After Savage was arrested in this case, he threatened to kill witnesses and their families.

After a lengthy trial before an anonymous jury, Russell, Northington, Walker, and

---

[1]The remaining 14 defendants pled guilty. (As noted, Thomas died before trial.)

4

Savage were convicted of conspiring to manufacture and distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). The jury convicted Russell, Walker, and Savage of two counts of using a telephone to facilitate drug trafficking, in violation of 21 U.S.C. § 843(b). Savage and Stein were convicted of money laundering (Savage under 18 U.S.C. § 1956(a)(1)(B)(i), Stein under 18 U.S.C. §§ 1957 and 2),[2] and Stein was also convicted of conspiring to launder money, in violation of 18 U.S.C. § 1956(h). Both Savage and Northington were convicted of one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).[3] In addition, the jury convicted Savage of three counts of threatening a witness, in violation of 18 U.S.C. § 1512(a)(2)(A), and two counts of threatening to retaliate against a witness, in violation of 18 U.S.C. § 1513(b)(2).[4] After the verdict, the District Court denied the motions of Northington, Russell, and Stein for judgment of acquittal and for a new trial.

In separate sentencing hearings, the District Court sentenced (1) Savage to 360 months' imprisonment and five years of supervised release; (2) Russell to life imprisonment; (3) Northington to 235 months' imprisonment and five years of supervised

---

[2]Northington also was charged with money laundering, but the District Court granted his motion for judgment of acquittal on that count at the conclusion of the Government's case.

[3]Northington was acquitted of one felon-in-possession count, and Savage was acquitted of possessing a firearm in furtherance of a drug trafficking offense.

[4]The jury acquitted Savage of one count of threatening to retaliate against a witness.

5

release; (4) Walker to life imprisonment; and (5) Stein to 121 months' imprisonment and two years of supervised release. They appeal to us on various grounds.[5]

## II. Sufficiency of the Evidence

Russell and Northington challenge the sufficiency of the evidence supporting their convictions. Our review of a district court's grant or denial of a motion for judgment of acquittal based on the sufficiency of the evidence is plenary, and we apply the same standard as the district court. *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009). We examine the totality of the circumstances, and view the evidence in the light most favorable to the Government. *Id.* "We must uphold the jury's verdict if there is substantial evidence from which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *Id.* "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *Id.* (internal quotation marks and citation omitted).

### A. Russell

Russell argues that the Government's evidence proved only that he was an independent drug dealer, not that he engaged in a conspiracy to manufacture and distribute drugs. He further challenges the drug quantities proven by the Government. We reject his arguments, as did the District Court at the close of the Government's case and on Russell's post-trial motion.

---

[5]The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

Conspiracy requires "(1) a unity of purpose between the alleged conspirators; (2) an intent to achieve a common goal; and (3) an agreement to work together toward that goal." *United States v. Pressler*, 256 F.3d 144, 149 (3d Cir. 2001) (internal quotation marks and citation omitted). A "simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999). However, "even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation." *Id.* at 198 (internal quotation marks and citations omitted).

Here, the evidence presented at trial sufficiently demonstrated Russell's participation in the conspiracy—specifically, as a mid-level distributor for the Savage-Thomas drug organization. Russell was recorded on the wiretap negotiating a drug deal with Thomas on behalf of another charged co-conspirator, Demetrius Williams. Russell solicited Thomas's help in resolving a territorial dispute between himself and yet another charged co-conspirator, Malik Jones, after Jones "scared [his] worker off." Russell asked Thomas to order Jones to "leave [his worker] alone" because the "coke won't sell itself." This was persuasive evidence that Russell was involved in the drug conspiracy. *See id.* at 208 n.11 ("An internal dispute among members of a conspiracy can itself be compelling evidence that the conspiracy is ongoing and that the rivals are members of it." (internal quotation marks and citation omitted)).

7

The Government intercepted many other calls between Russell and Thomas that showed their dealings were "repeated" and "familiar," indicating that he "probably comprehend[ed] fully the nature of the group with whom he is dealing" and "ha[d] full knowledge of, if not a stake in, a conspiracy." *Id.* at 199. Indeed, the evidence showed that Thomas and Russell would meet at the home of Savage, the ringleader. Moreover, Thomas often fronted the drugs to Russell, and, as we have recognized, a "credit relationship may well reflect the kind of trust" indicating that the buyer was part of the conspiracy. *Id.* at 200. Based on this evidence, a reasonable juror could conclude that the Government proved the elements of conspiracy beyond a reasonable doubt.

Russell also argues that the Government failed to prove beyond a reasonable doubt that he conspired to distribute more than five kilograms of cocaine and more than 50 grams of crack cocaine. However, the various wiretapped calls provided sufficient proof of this amount. In addition, Russell was liable for all reasonably foreseeable criminal offenses committed by his co-conspirators during the course of, and in furtherance of, the drug conspiracy. *See Pinkerton v. United States*, 328 U.S. 640 (1946).

**B.     Northington**

Northington argues the evidence against him was insufficient to convict him of conspiracy because (1) he was incarcerated throughout much of the conspiracy's existence, (2) the Government improperly relied on the testimony of two cooperating witnesses, and (3) there was no proof he shared in the proceeds of the conspiracy. We do

8

not find his arguments persuasive.[6]

It is true that Northington was in prison during much of the conspiracy; thus he was not intercepted on the wiretaps. However, the Government presented much evidence to support the charges against him. Two witnesses at trial testified that Northington sold drugs for the Savage organization. Eugene Coleman testified that, when Northington was released from prison, he began selling crack for Savage again, and was present when Savage converted cocaine into crack. (Gov't Supp'l App. 290, 293.) According to Coleman, Northington had "his own block that he sold drugs on," located at 9th and Pike Streets. (*Id.* 291.) Stanley Smith also testified that Northington sold cocaine on Franklin and Pike Streets. (*Id.* 390.)

Northington argues that "[t]he problem with [Coleman's and Smith's] testimony . . . is that it is completely uncorroborated." (Northington Br. 22.) However, we have held that "uncorroborated accomplice testimony may constitutionally provide the exclusive basis for a criminal conviction." *United States v. Perez*, 280 F.3d 318, 344 (3d Cir. 2002) (internal quotation marks and citation omitted). In any event, the testimony of Coleman and Smith is corroborated by other evidence.

FBI agents observed Northington at Savage's home and at one of the conspiracy's cocaine pressing houses in early 2003. In February 2003, Northington was arrested in front of Savage's home for a parole violation. That same month, police searched

---

[6]Although Northington does not argue otherwise, his conviction for possessing a firearm as a convicted felon was also supported by sufficient evidence.

9

Northington's apartment and found extensive evidence of drug trafficking. (Gov't Supp'l App. 369–72, 378.) In April 2003, when police conducted a search of Savage's home, Northington was sleeping in the basement, and he gave a false name to the police. While carrying out this search warrant, agents found several letters written by Northington while he was in prison, telling Savage to "control the block" by going through his brother—"[t]hat way you and me . . . both can make some money off the Block . . . . [T]hat's my Block that I took and my product that I left my Bro[ther] with . . . " (*Id.* 670.) Northington further wrote that, once he returned home, he and Savage could "handle [their] business together." (*Id.* 669.)

The testimony of Coleman and Stanley, the surveillance evidence, the drug trafficking evidence in Northington's apartment, and Northington's letters to Savage provided more than sufficient evidence to support Northington's conspiracy conviction.

### III. Anonymous Jury

All five appellants challenge the District Court's use of an anonymous jury. We review this decision for abuse of discretion. *United States v. Scarfo*, 850 F.2d 1015, 1016 (3d Cir. 1988).

In support of its motion for an anonymous jury, the Government introduced tapes from a wiretap of Savage's prison cell. The tapes "reflect[ed] numerous threatening and violent remarks" by Savage—specifically, threats "to further intimidate witnesses at trial, . . . disrupt the judicial process[,] and intimidate jurors." (Gov't Supp'l App. 47.) The District Court granted the Government's motion on several grounds. First, the Court

reasoned that the evidence at trial relevant to the four counts of Savage's threatening witnesses "may raise a fear of physical harm or intimidation in the jurors." (*Id.* 48.) Second, the Court found that the media interest in the case since Savage's arrest "may raise an apprehension among the jurors." (*Id.*) Third, the Court found that there was evidence of Savage's "desire and intent to obtain the names and addresses of jurors for the purpose of intimidation or retaliation," as well as threats against witnesses, their families, prison guards, and law enforcement agents. (*Id.* 48–49.) We easily conclude that the Court did not abuse its discretion in empaneling an anonymous jury.

After making its decision, the Court ensured that the defendants were not prejudiced by it and were afforded a full *voir dire* inquiry. *See United States v. Eufrasio*, 935 F.2d 553, 574 (3d Cir. 1991). The written questionnaire submitted to the prospective jurors and the individual *voir dire* conducted during jury selection allowed counsel "intelligent[ly to] exercise [their] peremptory challenges." *Scarfo*, 850 F.2d at 1022. During *voir dire*, the Court gave the prospective jurors a neutral reason to explain why their identities would remain anonymous: "These steps are taken to protect your privacy and to aid in your work as jurors. I have done this to ensure that both sides will receive a fair trial in this case, as is both sides' right." (Gov't Supp'l App. 59.) This curative instruction dispelled "any possible inference of defendants' guilt arising from the use of an anonymous jury." *United States v. Thornton*, 1 F.3d 149, 154 (3d Cir. 1993); *see also Scarfo*, 850 F.2d at 1026 (concluding that the court's instructions "were proper in adequately protecting defendant from possible adverse juror inferences"). Therefore, we

11

reject appellants' challenge.[7]

## IV. Denial of Motion to Sever

All appellants except Savage argue that the District Court erred in denying their pre-trial severance motions made under Federal Rule of Criminal Procedure 14.[8] We review this decision for abuse of discretion. *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005). Even if the Court abused its discretion, we will not reverse unless the defendant shows "clear and substantial prejudice resulting in a manifestly unfair trial." *Id.* (internal quotation marks and citation omitted).

A "fundamental principle" of our federal system is a preference for "joint trials of defendants who are indicted together[,] because joint trials promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* (internal quotation marks, citation, and brackets omitted). Therefore, district courts

---

[7]Stein, for the first time on appeal, makes a First Amendment challenge to the use of an anonymous jury. Stein relies on *United States v. Wecht*, 537 F.3d 222 (3d Cir. 2008), which involved disclosure to the media of the jurors' names based on First Amendment principles. This is different than the Sixth Amendment argument Stein made to the District Court. *Id.* at 234 n.23 ("[T]he First Amendment right of access that the Media-Intervenors assert is distinct from a defendant's Sixth Amendment right to challenge the use of an anonymous jury."). Stein cites no case, and we have found none, allowing a defendant to attack his conviction based on an alleged violation of the general public's First Amendment right of access to jurors' names, nor does he identify any prejudice to him apart from the same potential for prejudice we consider in the Sixth Amendment context. We see no support for Stein's assertion that a "less stringent" test is applied for the Sixth Amendment than the First Amendment. In any event, for the reasons stated above, the use of an anonymous jury was appropriate in this case.

[8]Unlike Russell, Northington, and Stein, Walker did not move for severance in the District Court. Therefore, "he has waived the right to present that issue on appeal." *Thornton*, 1 F.3d at 153 n.5.

should grant a severance motion "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* (internal quotation marks and citation omitted).

Appellants argue that the District Court abused its discretion by refusing to sever their trials from Savage's, noting the prejudice that could stem from the use of an anonymous jury and the evidence concerning Savage's threats against witnesses and others. We disagree. It is well established that a "defendant is not entitled to severance merely because the evidence against a co-defendant is more damaging than that against him." *United States v. Adams*, 759 F.2d 1099, 1112 (3d Cir. 1985) (internal quotation marks and citation omitted). Instead, "[s]ome exacerbating circumstances, such as the jury's inability to 'compartmentalize' the evidence, are required." *Id.* at 1112–13 (citation omitted). Appellants have not shown any such exacerbating circumstances here.

They make a general spillover argument that the "evidence presented against Savage was so horrific that it had to spill over into the jury's mind," and that the "specter of violence against witnesses was highly prejudicial." (Russell Br. 47–48; Northington Br. 20.) However, such conclusory allegations of spillover effect do not warrant reversal. *Adams*, 759 F.2d at 1113 ("Appellants' conclusory allegations of a spillover effect do not meet their burden for justifying a reversal."); *see also United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981) ("Mere allegations of prejudice are not enough[,] and it is not sufficient simply to establish that severance would improve the defendant's chance of

13

acquittal."). The Government presented the evidence of Savage's intimidation and retaliation in a separate portion of the trial, and it was clear from the indictment and the evidence that only Savage was involved in that conduct. Russell cites as prejudicial a specific statement made by the Government during its opening statement—that "[t]his is a case about drugs, dirty money, illegal guns, fear and intimidation"—and argues it was prejudicial because Russell was not charged in the money laundering, weapons, and intimidation counts of the indictment. (Russell Br. 48.) After reviewing this portion of the transcript, we are not convinced this opening statement was prejudicial to Russell, or intended to be anything more than a general synopsis of the case as a whole.[9]

Stein also makes the spillover argument, as he (unlike the other appellants) was charged only with money laundering. As the District Court noted, the money laundering conspiracy and the drug-trafficking conspiracy were interrelated, and, had Stein been tried alone, the Government would still need to prove the laundered property was "the proceeds of specified unlawful activity"—the unlawful activity being the drug-trafficking conspiracy. In any event, although the amount of evidence was large, there is no indication the jury was unable to compartmentalize the evidence and reach a reliable verdict. Indeed, the Government structured the testimony to set apart the money laundering case and the threats from Savage.

Most importantly, the District Court instructed the jury on several occasions that

---

[9]Russell also relies on a statement concerning the firearms charges made in the Government's brief opposing his motion for a new trial, but this statement was not, of course, before the jury. (*See* Russell Br. 48.)

any evidence admitted solely against one defendant could not be considered against any other defendant, and gave a specific limiting instruction about Savage's recorded conversations.[10] We regard these instructions as "persuasive evidence that refusals to sever did not prejudice the defendant[s]." *Urban*, 404 F.3d at 776. Moreover, the jury acquitted Northington on one count. *Cf. United States v. Anderskow*, 88 F.3d 245, 255 n.9 (3d Cir. 1996) (concluding that the appellant-defendant's "acquittal on every substantive count of wire fraud . . . demonstrates conclusively that he suffered no prejudice from any 'spillover' evidence"). Appellants have not met their heavy burden, and thus the District Court did not abuse its discretion in denying the motion to sever.

## V. Stein's Money Laundering Convictions

Stein raises various arguments to his conviction on Count Two (money laundering

---

[10]*See* Gov't Supp'l App. 78–79 (Preliminary Jury Instructions) ("[Y]ou must bear in mind that your verdict as to each defendant must be determined separately with respect to him, solely on the evidence or lack of evidence presented against him, without regard to the guilt or innocence of anyone else. . . . Let me emphasize that any evidence admitted solely against one defendant may be considered only as against that defendant, and may not, in any way, enter into your ultimate deliberations with respect to any other defendant."); *id.* 564–65 (Closing Jury Instructions) ("[S]ome of the evidence in this case was limited to just one defendant or another. For example, the Government introduced as evidence tape recordings of conversations between Mr. Kaboni Savage and other inmates at the Federal Detention Center. These tape recordings were only admitted against Mr. Savage. Let me emphasize that any evidence admitted solely against one defendant may be considered as only against that defendant and may not in any respect enter into your deliberations on any other defendant. In reaching your verdict, bear in mind that guilt or innocence is personal and individual. Your verdict of guilty or not guilty must be based solely upon the evidence with respect to each defendant. The case against each defendant on each count with which he is charged stands or falls upon the proof or lack of proof against that defendant alone. Your verdict as to any defendant on any count should not control your decision as to any other defendant in any other count.").

15

conspiracy in violation of 18 U.S.C. § 1956(h)) and Count Three (money laundering in violation of 18 U.S.C. §§ 1957 and 2). We discern no reversible error.

## A.    Count Two

Count Two charged Stein (together with Thomas, who, as noted, died before trial) with conspiracy under 18 U.S.C. § 1956(h). The object of the charged conspiracy was money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). That statute provides, in relevant part:

> Whoever, knowing that the property involved in a financial transaction represents the *proceeds of some form of unlawful activity*, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
> . . .
> (B)    knowing that the transaction is designed in whole or in part—
>        (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i) (emphasis added). Stein argues that the District Court incorrectly defined the term "proceeds," as used in 18 U.S.C. § 1956, in its instructions to the jury.

Because Stein raises this argument for the first time on appeal, we review the jury instruction for plain error. *United States v. Williams*, 464 F.3d 443, 445 (3d Cir. 2006).

> Under the plain error standard, before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error

16

seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Id.* (internal quotation marks, citation, and brackets omitted).

At the time of trial, "proceeds" was not defined in the statute. The District Court instructed the jury that "proceeds" were "any property or any interest in property that someone acquires or retains as a result of the commission of the specified unlawful activity." (Gov't Supp'l App. 566.) The "specified unlawful activity" in this case was "the conspiracy to manufacture and distribute cocaine and cocaine base." (*Id.*) According to Stein, the Court's instruction was contrary to the Supreme Court's decision in *United States v. Santos*, 128 S. Ct. 2020 (2008), because it did not distinguish between "profits" and "receipts" in defining "proceeds."[11]

In *Santos*, the five-Justice majority was fractured. Justice Scalia, writing for a four-Justice plurality, invoked the rule of lenity to hold that "proceeds" always means "profits" under 18 U.S.C. § 1956—the more defendant-friendly interpretation. 128 S. Ct. at 2025 (plurality opinion). Justice Alito wrote for the four Justices in dissent to reach the opposite conclusion—that "proceeds" always means "gross receipts." *See id.* at 2036 (Alito, J., dissenting). Justice Stevens concurred in the judgment to provide the fifth vote, but disagreed that "proceeds" *always* means "profits." Instead, he concluded that the meaning of "proceeds" in § 1956 depends on the underlying "specified unlawful

---

[11]In 2009, Congress legislatively overruled *Santos* by amending § 1956 to add the following definition of proceeds: "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9) (2009).

activity." *Id.* at 2031–32 (Stevens, J., concurring). He agreed with the four-Justice

plurality that, in the illegal-gambling business context, "proceeds" means "profits." *Id.* at

2033 (Stevens, J., concurring). Because "his vote [wa]s necessary to [the] judgment, and

. . . his opinion rests upon the narrower ground, the Court's holding is limited

accordingly." *Id.* at 2031 (plurality opinion); *see also Marks v. United States*, 430 U.S.

188, 193 (1977).

Thus, we only know from *Santos* what "proceeds" means when an illegal

gambling business is the "specified unlawful activity." When instead a drug conspiracy is

the "specified unlawful activity," the law is unclear as to whether "proceeds" means

"profits" or "gross receipts." *See United States v. Kratt*, 579 F.3d 558, 563 (6th Cir.

2009) ("Even after accounting for Justice Scalia's and Justice Stevens' opinions,

'proceeds' remains an ambiguous term . . . .").

Because there is no governing precedent resolving this issue, we cannot say that

the District Court committed plain error.[12] *See United States v. Chau*, 426 F.3d 1318,

1322 (11th Cir. 2005) (*per curiam*) (when "the explicit language of a statute or rule does

not specifically resolve an issue, there can be no plain error where there is no precedent

from the Supreme Court or this Court directly resolving it" (internal quotation marks and

---

[12]Moreover, we note that, contrary to Stein's argument, a majority of the *Santos* Court appeared to agree that "proceeds" in the context of a drug conspiracy means "gross receipts," not "profits." *See* 128 S. Ct. at 2036 & n.1 (Alito, J., dissenting) (stating that "five Justices agree with the position" that "the term 'proceeds' 'include[s] gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales'") (quoting Justice Stevens's concurrence) (alteration in original).

citation omitted)).  We thus affirm Stein's conviction on Count Two.

**B.     Count Three**

Count Three charged Stein with "knowingly engag[ing]. . . in a monetary transaction in criminally derived property of a value greater than $10,000 . . . derived from specified unlawful activity."  18 U.S.C. § 1957(a).  "Monetary transaction" is defined as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in § 1956(c)(5) of this title) by, through, or to a financial institution . . . , including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title."  *Id.* § 1957(f)(1).  The indictment alleged that, in June 2001, Stein gave a $50,000 check to Paul Daniels, payable to Philadelphia Entertainment Group, in exchange for $50,000 in cash drug proceeds.  Stein held the cash in his possession for six months as collateral.[13]  (Gov't Supp'l App. 27.)

Stein argues that the indictment failed to allege that a "financial institution" was involved, as required for conduct to violate 18 U.S.C. § 1957.  We exercise plenary review over the challenge to the sufficiency of the indictment, and look only to "the facts alleged within the four corners of the indictment." *United States v. Vitillo*, 490 F.3d 314,

---

[13]At trial, Daniels testified that he wanted to use his cash drug money to start a concert promotion company.  (Stein Deferred App'x 263.)  He therefore asked Stein for a check "to make the paper trail look legit for the show."  (*Id.*)  Daniels packaged $5,000 stacks of $20 bills in a black shoebox, which he delivered to Stein at his home.  (*Id.* 267.)  Daniels testified that Stein charged him 12% interest to make the loan appear legitimate.  (*Id.* 269–70.)

320–21 (3d Cir. 2007) (internal quotation marks and citation omitted). "An indictment is generally deemed sufficient if it: (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989) (internal quotation marks, citation, and brackets omitted). An indictment does not state an offense sufficiently if the specific facts that it alleges "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002).

Though Stein did not raise this argument before or at trial, a "defendant may challenge an indictment for failure to charge an offense for the first time on appeal." *United States v. Cefaratti*, 221 F.3d 502, 507 (3d Cir. 2000). "[I]ndictments which are tardily challenged are liberally constructed in favor of validity," and the indictment will be upheld "unless it is so defective that it does not, by any reasonable construction, charge an offense." *Vitillo*, 490 F.3d at 324 (internal quotation marks and citations omitted).

We do not agree with Stein's assertion that the mere exchange of drug proceeds for a check is not "by, through, or to a financial institution." As the Government points out, the term "monetary transaction" also "includ[es] any transaction that would be a financial transaction under [18 U.S.C. §] 1956(c)(4)(B)." Section 1956(c)(4)(B), in turn, defines "financial transaction" as "a transaction involving the use of a financial institution which

20

is engaged in, or the activities of which affect, interstate commerce in any way or degree." In our case, Stein wrote a check to Daniels to be drawn on an account Stein maintained at a financial institution. In exchange, he received $50,000 cash. The indictment sufficiently charged the exchange of a monetary instrument "through" and "involving the use of" a financial institution.[14] *See United States v. Jackson*, 935 F.2d 832, 841 (7th Cir. 1991) ("Writing a check, whether for cash or to a vendor who has provided services, falls within the definition of a 'financial transaction' contained in § 1956(c)(4)(B) because it involved [a bank] . . . .").[15]

In addition, Stein argues that the indictment was constructively amended (or, in the alternative, that there was a prejudicial variance) because the Government presented evidence that Daniels deposited Stein's check, rather than relying solely on the exchange of the check for cash as alleged in Count Three. Because Stein did not raise this argument before or during trial, we review for plain error. *United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010).

"An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the

---

[14]Stein also argues that the monetary transaction was not "in criminally derived property." However, the $50,000 cash was alleged to be proceeds from the drug conspiracy, and the check he wrote was derived from those proceeds. This element was thus satisfied. *Cf. United States v. Covey*, 232 F.3d 641, 645–46 (8th Cir. 2000).

[15]Stein asserts that the evidence was insufficient to prove that he engaged in a "monetary transaction," but in doing so does not actually argue that the Government failed to prove at trial the facts as alleged in the indictment. Instead, he merely reiterates his legal challenges to the sufficiency of the indictment itself.

charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *Id.* at 532 (internal quotation marks and citation omitted). This can occur "through evidence, arguments, or the district court's jury instructions." *Id.* (internal quotation marks and citation omitted). A constructive amendment is presumptively prejudicial even under plain error review. *Id.*

"A variance occurs where the charging terms of the indictment are not changed but when the evidence at the trial proves facts materially different from those alleged in the indictment." *Id.* (internal quotation marks and citation omitted). A variance must prejudice some substantial right to constitute reversible error. *Id.*

Stein's support in the record for his argument is slim. He relies on the Government's entering into evidence the check he wrote to Daniels, the back of which showed the endorsement. The endorsement was mentioned briefly during testimony, when Daniels testified on direct examination that the check was endorsed by his sister. (Stein Supp'l App. 266.) But Stein cites to no other mention by the Government of the check's deposit. Despite Stein's suggestion to the contrary. the Government did not discuss the deposit in its closing arguments. (*See* Stein Br. 46, 48 (citing Stein Supp'l App. 345).) Nor did the Court's jury instructions mention the check deposit (as Stein himself admits) or suggest that the jury could convict Stein based on it. As the brief mentions of the check's deposit are far from sufficient to constitute a constructive amendment or a prejudicial variance, there was no plain error.

22

## VI. Admission of Expert Testimony

Russell challenges the admission of expert testimony by Special Agent Kevin Lewis, which we review for abuse of discretion. *Gibbs*, 190 F.3d at 211.

After a hearing, the Court qualified Lewis as an expert on cocaine trafficking, ruling that Lewis could testify what certain words used in the wiretapped conversations meant "generally across the whole area of drug trafficking in cocaine," but not what those words meant "in this particular case." (Gov't Supp'l App. 75.) In accord with this ruling, Lewis testified about the meaning generally of certain words used in the intercepted calls, and the quantities, sale values, and processing terminology of cocaine and crack cocaine. (*See* Russell Addendum to App. 10, 15.)

"[I]t is well established that experienced government agents may testify to the meaning of coded drug language under Fed. R. Evid. 702." *Gibbs*, 190 F.3d at 211; *see also United States v. Watson*, 260 F.3d 301, 307 (3d Cir. 2001) (noting that "the operations of narcotics dealers have repeatedly been found to be a suitable topic for expert testimony because they are not within the common knowledge of the average juror"). "Because the primary purpose of coded drug language is to conceal the meaning of the conversation from outsiders through deliberate obscurity, drug traffickers' jargon is a specialized body of knowledge and thus an appropriate subject for expert testimony." *Gibbs*, 190 F.3d at 211. As that is exactly what the District Court qualified Lewis to discuss, we readily affirm the admission of his expert testimony.

Russell also asserts that Lewis improperly testified as to Russell's state of mind

and intent.  However, in the portions of the transcript relied on by Russell, there is no indication that Lewis so testified.  (*See* Russell Br. 42–44; Russell Addendum to App. 10–15, 20–24.)  Instead, Agent Lewis properly testified in general terms in accordance with the District Court's ruling.  Accordingly, we see no error.

## VII.  Sentencing Issues

"Our responsibility on appellate review of a criminal sentence is limited yet important: we are to ensure that a substantively reasonable sentence has been imposed in a procedurally fair way."  *United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008). This proceeds in two stages.  First, we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range."  *Gall v. United States*, 552 U.S. 38, 51 (2007).  Second, we consider the totality of the circumstances to determine whether the sentence is substantively reasonable.  *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (*en banc*).  "[I]f the district court's sentence is procedurally sound, we will affirm it unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided."  *Id.* at 568.  "The abuse-of-discretion standard applies to both our procedural and substantive reasonableness inquiries."  *Id.* at 567.

24

## A. Savage

Savage, 31 years old at the time of sentencing, argues that his 360-month below-Guidelines sentence was substantively unreasonable, citing his minimal prior criminal record, his relationship with his family members, and the lack of harm to the witnesses he threatened. He does not challenge the procedural reasonableness of his sentence.

The District Court concluded Savage was responsible for between 50 and 150 kilograms of cocaine, a smaller amount than recommended by Probation in the Presentence Report ("PSR"). This resulted in a base offense level of 36. Two levels were added for possessing a firearm during the offense under U.S.S.G. § 2D1.1(b)(1), an aggravating role enhancement added three levels under § 3B1.1(b), two levels were added for obstruction of justice under § 3C1.1, and two levels were added under § 5K2.0 because of the nature of Savage's threats against Government witnesses.[16] The resulting total offense level was 45. With a Criminal History Category of I, Savage's Guidelines range was life imprisonment. He was subject to a mandatory minimum sentence of ten years.

In sentencing Savage, the Court considered the substantial number of kilograms of

---

[16]For example, Savage was recorded telling someone about threats he had recently made to other prisoners: "I said, 'You know what it's gonna cost you . . . your life bitch, and your mom['s] life. I'm gonna kill your mother fucking ass. Tell the prosecutor I threatened you too, bitch. . . . I'm gonna kill everything you love.'" (Gov't Supp'l App. 673–74; *see also id.* at 680–81 ("You know P got a baby by Chad's sister . . . [; t]hat's the one I said I'm gonna kill.").) In another exchange, a fellow prisoner told Savage that "[b]y [the] time of trial everybody be dead," to which Savage laughed and responded, "we just getting started." *Id*. at 678.

cocaine, the guns, money laundering, and Savage's threats to witnesses and their families. The Court also considered Savage's minimal prior criminal history and the support from his family and the community. The Court varied downward and imposed a sentence of 360 months' imprisonment.

Savage's sentence "falls within the broad range of possible sentences that can be considered reasonable in light of the § 3553(a) factors," *United States v. Wise*, 515 F.3d 207, 218 (3d Cir. 2008), and thus we affirm.

### B.    Russell

Under 21 U.S.C. § 841(b)(1), Russell was subject to a mandatory minimum sentence of life imprisonment based on his prior felony drug offenses and the amount of drugs involved (as noted, the jury found at least five kilograms of cocaine and at least 50 grams of cocaine base). As required by statute, the Court sentenced him to life imprisonment.

Russell argues that the Government failed to prove beyond a reasonable doubt the amount of drugs necessary to trigger the mandatory penalty of life imprisonment, and therefore sentencing him based on that amount was error. However, as discussed above in Part II.A, the evidence was sufficient to support the jury's verdict.

Russell also argues that his sentence to the statutory mandatory minimum term of life imprisonment violated his constitutional rights. These arguments are foreclosed by Supreme Court and our precedent. *See Almendarez-Torres v. United States*, 523 U.S. 224, 226–27 (1998); *United States v. Walker*, 473 F.3d 71, 76 (3d Cir. 2007)*; United*

26

*States v. MacEwan*, 445 F.3d 237, 252–53 (3d Cir. 2006). We thus affirm Russell's sentence.

## C. Northington

The District Court calculated Northington's base offense level as 32, based on more than five but less than 15 kilograms of cocaine. The Court adopted the PSR's recommendation of a two-level increase for possession of a firearm during the offense, under U.S.S.G. § 2D1.1(b)(1), and a two-level increase for obstruction of justice, under § 3C1.1, resulting in a total offense level of 36. The Court rejected Northington's request for a two-point reduction for minor role and his objections to the obstruction of justice enhancement and the calculation of his criminal history points. With a Criminal History Category of II, Northington's Guidelines range was 235–293 months' imprisonment. The Court sentenced him to 235 months.

Northington raises five challenges to his sentence. First, he argues the Court erred in failing to vary downward from the Guidelines range based on the sentencing disparity between the crack and powder cocaine Guidelines, and that we should consider the Guidelines amendment providing for a two-level reduction in base offense level for crack cocaine offenses. However, these arguments are misplaced, as Northington's Guidelines range was based solely on powder cocaine, not crack cocaine. (Northington App. 428, 526; Northington PSR ¶ 108.)

Second, Northington argues the District Court erred in denying his request for a reduction under U.S.S.G. § 3B1.2, which authorizes a two-level reduction in offense level

if the defendant was a "minor participant" in the criminal activity. A minor participant is one "who is less culpable than most other participants, but whose role could not be described as minimal." *Id.* § 3B1.2 cmt. n. 5. The sentencing court is afforded broad discretion in the application of this section, which is "heavily dependent on the facts of a particular case." *United States v. Isaza-Zapata*, 148 F.3d 236, 238 (3d Cir. 1998).

The District Court found that Northington's letters to Savage, the testimony at trial, and the drugs found in Northington's apartment showed that he was selling drugs for the conspiracy. The Court reasoned that it had given the minor role adjustment to one other person in the conspiracy, who was "in a very different situation" than Northington, and denied the adjustment. (Gov't Supp'l App. 600.)

Northington contends that the downward adjustment was warranted because he was not intercepted on the wiretap, was not observed selling drugs, and was incarcerated throughout much of the conspiracy. However, the evidence against him, as discussed in Part II.B, amply supports the District Court's denial of his request for the adjustment.

Third, Northington argues that the District Court erred in calculating his criminal history points. He received three points under U.S.S.G. § 4A1.1(a) for a prior conviction and two points under § 4A1.1(d) for committing the offense in this case while on probation.[17] While he asserts that he was not on probation at the time of the offense in

---

[17]Northington incorrectly states in his brief that two points were added under § 4A1.1(e) because "this current offense was committed within two years of release." (Northington Br. 31.) His PSR unambiguously states that "no points are added for the defendant committing the offense within two years of his release" because of "complications with the defendant's parole." (Northington PSR ¶ 127.)

this case, he provides no support for this argument. The record reflects that his probation was terminated in March 2003, well after he became involved in the drug conspiracy for which he was convicted here. (*See* Northington PSR ¶ 123–25; Northington App. 447–48.)

Fourth, Northington argues that the District Court erred in enhancing his offense level for obstruction of justice. As he admits in his brief that he threatened to kill members of a witness's family after the first day of that witness's testimony, this enhancement was appropriate. *See* U.S.S.G. § 3C1.1, cmt. n. 4(a) (obstructive conduct includes "threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . ., directly or indirectly, or attempting to do so").

Finally, Northington claims that because "this case originated in the state system," in which punishment is substantially different, the Court was required to depart downward. He provides no support for this argument, and it is without merit.

For these reasons, we affirm Northington's sentence.

### D. Walker

Walker was sentenced to a mandatory term of life imprisonment pursuant to 21 U.S.C. § 841(b)(1). His attorney argues that Walker's age and his "relatively minor role" in the conspiracy "outweigh the mandatory minimum," but admits he cannot "provide any precedent in support" of an argument that such factors can overcome a statutory mandatory minimum. (Walker Br. 4–5.) Thus, his arguments also lack merit.

\* \* \* \* \*

For these reasons, we affirm appellants' judgments of conviction and sentence.